**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ellowood Eugene BENNETT, Defendant–Appellant,**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ray Austin BENNETT, Defendant–Appellant.**

Nos. 91–5588, 92–5115.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 1992.

Decided Jan. 19, 1993.

As Amended Jan. 27, 1993.

John W. Cooper, Cooper & Preston, Parsons, WV, argued (Lori M. Hood, on the brief) for appellant Ray Bennett.

David Ray Rexroad, Rexroad & Rexroad, Buckhannon, WV, argued, for defendant-appellant Ellowood Bennett.

David Earl Godwin, First Asst. U.S. Atty., Clarksburg, WV, argued (William A. Kolibash, U.S. Atty., Clarksburg, WV, Lisa A. Grimes, Asst. U.S. Atty., Wheeling, WV, on the brief) for plaintiff-appellee.

Before HAMILTON, Circuit Judge, SPROUSE, Senior Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

OPINION

PER CURIAM:

Following a jury trial before Chief District Judge Robert Earl Maxwell in the Northern District of West Virginia, appellants, Ellowood Eugene Bennett (Eugene) and his brother, Ray Austin Bennett (Ray), were convicted of numerous offenses arising from a Racketeering Influenced and Corrupt Organizations Act (RICO) [1] associated-in-fact enterprise designed to defraud insurance companies by burning insured real estate. The appellants raise numerous assignments of error. Finding no merit to these assignments of error, we affirm.

1. 18 U.S.C. §§ 1961–1963.

I

As required, we recount the facts in a light most favorable to the government. *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir.1982); *Jackson v. Virginia*, 443 U.S. 307, 317–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). That evidence demonstrated that beginning in late 1979 and continuing until late 1986, the appellants associated at various times with each other and others to burn insured real estate for the purpose of obtaining the insurance proceeds.

The criminal activity occurred in Upshur County, West Virginia, and created more problems for an already economically depressed area. From 1980 to 1987, several major interstate insurance companies stopped writing insurance in Upshur County. In addition, the average homeowner's policy in Upshur County costs approximately three times more than a policy in neighboring counties.

The leading figure of the enterprise was Eugene. At various times throughout the enterprise's seven-year reign, Eugene encouraged and received the assistance of various individuals to own, lease, or burn property, and to commit various acts of violence in order to sustain the continuance of the enterprise. The properties were generally not in readily marketable condition, enabling the enterprise to reap great profits because the average homeowner's insurance policy provided for replacement value.

A

About three days before January 1, 1980, Eugene offered Arnold Dale Phillips and Robert Burr (now deceased) $2,500 to burn a house (Adrian house) occupied by Eugene and his then-wife Cleona in the Village of Adrian, West Virginia.[2] Shortly after midnight on January 1, the house was destroyed by fire. Prior to the fire, Edward Heater saw Eugene enter the house. Within minutes, Heater heard an explosion and the house burned to the ground.[3] Eugene later explained to a friend, Terry Grandinette, that he burned the house by employing some kind of timing device on the hot water tank. As a result of the loss, Eugene received $40,000 from Westfield Insurance Company.

The next arson orchestrated by the enterprise was the "Simmons' fire." The Simmons' house was sold by Eugene to Sherwood Simmons in October 1979 for $13,500. Shortly after the sale, Simmons complained that the house was infested with powder post beetles. Eugene suggested that the house be burned for the insurance proceeds. Simmons, after initially refusing, agreed. When Simmons tried to back out after discussing the proposition with his wife, Eugene replied that he would "burn [the house] down around your ears." J.A. at 296.

To effectuate this arson, Eugene offered Mark Howes and Grandinette each $2,000 to burn down the Simmons' house. Grandinette refused. Thereafter, Eugene solicited the assistance of Michael Lee Johnson. On May 26, 1980, Johnson spread gasoline on a couch in the Simmons' house and set it on fire. The resulting fire did not destroy the house.

The following day, Eugene and Howes returned to the Simmons' house to inspect the damage. According to Howes, the couch in the Simmons' house was not "burnt solid." Rather, it was burned in places, suggesting arson as the cause. Howes testified that the place looked like "the perfect place to catch somebody for arson." J.A. at 3184. Later that day, Eugene solicited Howes and Ray to burn the Simmons' house that night.

Howes returned to the Simmons' house later that night in a vehicle driven by Ray. Upon arriving, Howes set the house ablaze, this time destroying it. Shortly after the fire, Basil Brown saw Ray and Howes

2. Eugene and Cleona Bennett were married in 1971 and were divorced in 1983.

3. Edward Heater testified "It looked like—there was a loud noise and it looked to me like the roof just lifted off [the house] and there was that big explosion and all the windows busted." Joint Appendix (J.A.) at 274.

walking away from the Simmons' house. A few days later, Ray and Brown met outside the Adrian Post Office. Ray told Brown that his life would be in jeopardy if he said anything about the Simmons' fire.[4]

The next series of arsons consisted of burning essentially the same property three times. For the sake of clarity, we will refer to it as the "Deever property." By a land contract dated February 3, 1983, Barbara Deever purchased the Deever property from Eugene and Cleona Bennett. Deever eventually insured the property for $51,000 with West Virginia Fire & Casualty Company. On two occasions, Eugene approached Deever in an effort to entice her to have the property burned for the insurance proceeds. Deever refused.

Thereafter, Eugene tried to get one of Deever's sons, Larry Anderson, to burn the property. He refused. Eugene approached another one of Deever's sons, Jimmy Anderson, with the same quick-money proposition. Jimmy Anderson eventually agreed to burn the property for $1,000. On June 30, 1983, Jimmy Anderson burned the property using charcoal lighter fluid that Eugene had provided. The insurance proceeds were paid to Deever. However, she signed most of the insurance proceeds ($25,000 of approximately $35,000 received) over to Eugene because Eugene allegedly had to pay off an outstanding mortgage on the property.

On November 3, 1983, the property was sold by Deever to Larry Tenney for $500. About one month later, Tenney sold the property to Ray for $500. On January 13, 1984, Ray insured the property for $40,000. After Ray completed some repair work on the property, the property burned on July 2, 1984. The State Fire Marshall did not investigate the fire, but the insurance company, Great American Insurance Company (Great American), did. The insurance investigator, George Dishner, concluded that the fire was intentionally set. In reaching this conclusion, Dishner eliminated accidental causes and offered his opinion that some type of accelerant started the fire.

Ray submitted a claim to Great American.. Great American refused to pay the claim pending the outcome of its investigation. Ray eventually filed a complaint with the state insurance commissioner's office which requested a response from Great American. Rather than pursuing litigation, Great American entered into a settlement with Ray in which it agreed to pay him $30,000.

On September 3, 1985, Ray sold the property to Eugene for $700. Eugene joined the Deever property with an adjacent piece of property he owned and, in February 1986, Eugene obtained insurance on the property in the amount of $10,000 from the Municipal Mutual Insurance Company. In the beginning of March 1986, Eugene entered into a land contract with Elna Christine George for the sale of the now-enlarged Deever property for $18,000. Eventually, the property burned and Eugene collected $10,000 in insurance proceeds from Municipal Mutual Insurance Company.

B

On February 25, 1985, property known as the Woodford property located in French Creek, West Virginia, burned, resulting in the death of an eight-year old child, Sally Rice. The property was owned by Eugene. Eugene purchased the Woodford property shortly before the Adrian house fire for $38,000. At the time Eugene purchased the Woodford property, it was being used as an Amoco station and general store. The Woodford property also had a residence incorporated in the same structure. Around April 1980, Eugene moved into the residence, making it his permanent dwelling. In 1981, Eugene closed the store and began converting portions of the property

4. As a result of this fire, Eugene was tried on arson-related charges in state court. He was acquitted. Basil Brown appeared as a witness for the state. Hubert Gregory testified, however, that he saw Simmons leave the scene of the fire. Gregory was eventually subpoenaed before a federal grand jury in late 1987 where he repeated the same testimony. After his appearance, he admitted that his testimony was false and signed a plea agreement agreeing to plead guilty to perjury.

into rental units. Eugene continued to occupy the main level of the residence, but converted the upper and lower floors into apartments. In November 1984, Catherine Rice, later Catherine Rice Bennett, moved to the Woodford property with two of her children, Sally and Henry, occupying an apartment on the upper level of the residence.[5]

Eugene engaged in several conversations before and after the fire relating to the Woodford property. Before the fire, Eugene, using a diagram of the premises, discussed the burning of the property with Hubert Gregory and Howes. The parties concluded that the hot water tank would be an excellent place to start a fire.[6] Eugene also told Gregory that the rental units would make the property more valuable for insurance purposes. After the fire, Eugene told Donald Perrine that one of his boys set the fire by removing the gas line from the stove in the bathroom[7] on the main level of the residence.

The circumstances surrounding the fire are most unpleasant. Shortly after going to bed, Sally Rice's brother, Henry, came down the stairs from the upper level of the residence and saw Eugene's son, Lonnie, at the stove in the bathroom on the main level. Henry saw Lonnie remove the flexible line from the stove and also observed that Lonnie possessed matches. After seeing Henry, Lonnie ordered him back upstairs. Lonnie admitted that he had been in the main floor bathroom immediately before the fire, but denies removing the line. Henry returned to his apartment and went back to sleep, only to awaken shortly thereafter because the residence was on fire. Henry ran down the stairs and exited the residence through a sliding glass door. In an attempt to save Sally's life, Henry yelled to Sally. Sally was unable to leave and died in the fire. All of Eugene's children present in the residence escaped. Eugene collected $43,000 for the loss of the structure and $20,000 for the loss of the contents from Family Farm Mutual Insurance Company. The policy also provided liability coverage up to $100,000.

C

In response to a state investigation of the arson problem in Upshur County, the focus of the enterprise in late 1986 shifted from arson to acts of violence and obstruction of justice in order to protect the criminal activity from discovery. One such act occurred in the fall of 1986 when Eugene hired Cyrus Jonathan George to kill Dallas Rice (Dallas), the father of Henry and Sally Rice, and the ex-husband of Catherine Rice Bennett.[8] The motivating factors behind this were: (1) Dallas was entitled to 50% of any recovery that was obtained under the liability clause of Eugene's insurance policy on the Woodford property for Sally's wrongful death; (2) Dallas had obtained custody of his surviving children from Catherine Rice Bennett; and (3) Catherine Rice (later Rice Bennett) would be entitled to social security benefits for Dallas' death. The contract price was $3,500. On November 1, 1986, Dallas Rice was shot and wounded near his residence.[9] Later that month, Donald Perrine was present at Eugene's residence when George arrived and asked for payment.

Later that year, Eugene, Perrine, and Mike Sheets met at a bar in Buckhannon, West Virginia. At this meeting, Eugene gave Perrine a gun with the instructions to shoot through Deputy Sheriff Kenneth Fitzgerald's house for the purposes of "getting some of the heat off of [Eugene's]

5. Catherine Rice Bennett was romantically involved with Eugene prior to her moving to the Woodford property. Eugene and Catherine Rice Bennett later married in May 1987.

6. On another occasion, Eugene explained to Gerald Heater that because the hot water tank was made out of chipboard "it would burn easy." J.A. at 1684.

7. The stove in the main floor bathroom appears to be similar, if not identical, to a gas space heater.

8. Dallas Rice and Catherine Rice Bennett were divorced in 1984, shortly before Catherine Rice Bennett moved to the Woodford property.

9. The evidence discovered at the scene led to the arrest of Cyrus Jonathan George in February 1987.

back...." J.A. at 3545. Perrine, who was a confidential informant at the time, never carried out the attack. Instead, he gave the gun to the Upshur County Sheriff's Office who returned it to Perrine in an effort to keep his confidential status. During this same time frame, Perrine met with Eugene and Catherine Rice Bennett at Eugene's house. Eugene attempted to hire Perrine to kill Michael Lee Johnson. Johnson was a potential witness in Eugene's state court trial on arson related charges pertaining to the Simmons' fire. Perrine, who was also working as a confidential informant, recorded this conversation. The attack was apparently not carried out.

In 1987, a federal grand jury sitting in the Northern District of West Virginia began investigating the activities of the enterprise. On October 29, 1987, Ray testified before a federal grand jury. The following exchange took place before the grand jury:

Q. Mr. Bennett, do you admit or deny that you helped burn the Simmons' place, do you admit or deny that?

A. I deny it [sic] of helping.

Q. Did you drive anybody up there who burned it?

A. No.

J.A. at 54.

After he committed perjury relating to the Simmons' fire before a federal grand jury in late 1987, Hubert Gregory began to cooperate with the federal authorities investigating the case. In January 1988, Eugene attempted to bribe Gregory into taking the blame for one of the arsons. In exchange, Gregory would not cooperate with federal investigators and would receive an agreed monthly income while serving time.

### D

On December 8, 1989, a federal grand jury returned a seven-count indictment charging Eugene with various offenses arising out of the Woodford fire that resulted in the death of Sally Rice. A superseding indictment was returned on April 16, 1990, which named the appellants and six others. The superseding indictment alleged that Eugene, Ray, Cyrus Jonathan George, Harmon John George, and Catherine Rice Bennett associated together as an enterprise to commit acts of arson and to use the mails for the purpose of defrauding insurance companies. The indictment further alleged that the defendants and others committed acts of violence and acts of obstruction of justice in order to further the enterprise.

Count one charged Eugene, Ray, Cyrus Jonathan George, and Harmon John George with participation in an enterprise which engaged in a "pattern of racketeering" activity in violation of RICO, 18 U.S.C. § 1962(c). Count one specifically enumerated twelve predicate acts that allegedly demonstrated a pattern of racketeering:

1. Arson of the Adrian property on January 1, 1980;

2. Arson of the Simmons' residence on May 26 and May 27, 1980;

3. Arson of a house owned by Arnold Dale Phillips on May 8, 1983;

4. Arson of the Deever property on June 30, 1983;

5. Arson of the Deever property on July 2, 1984;

6. Mail fraud as charged in counts five through seven of the superseding indictment;

7. Mail fraud as charged in counts eight through eleven of the superseding indictment;

8. Mail fraud as charged in counts twelve through fourteen of the superseding indictment;

9. The conspiracy to commit and the attempted murder of Dallas Rice;

10. The conspiracy to commit and the attempted murder of Sheriff Fred Gaudet;

11. The obstruction of a criminal investigation by Harmon John George on January 23, 1988; and

12. The obstruction of a criminal investigation by Eugene and Ray on January 29, 1988.

In count one, Eugene was named in predicate acts one, two, three, four, six, seven,

nine, ten, and twelve, and Ray was named in predicate acts five, eight, and twelve.

Listing eighty-three overt acts, including the predicate acts listed in count one, count two charged Eugene, Ray, Cyrus Jonathan George, Harmon John George, and Catherine Rice Bennett with conspiring to participate in an enterprise which is engaged in a "pattern of racketeering" activity in violation of RICO, 18 U.S.C. § 1962(d). Count three charged Eugene with aiding and abetting the malicious destruction of property affecting interstate commerce resulting in the death of another person in violation of 18 U.S.C. §§ 2 and 844(i). Count four charged Eugene with using fire to commit mail fraud in violation of 18 U.S.C. § 844(h). On the basis of a submission of insurance claim by Eugene, checks sent by Farm Family Mutual Insurance Company to Eugene, and various memos and reports between GAB Business Services and Municipal Mutual Insurance Company, counts five through eleven charged Eugene with aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2 and 1341. Counts twelve through fourteen charged Ray and John William Riffle with aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2 and 1341. Counts fifteen through eighteen charged Eugene and Cyrus Jonathan George with various crimes of violence in aid of racketeering. The conspiracy to murder and the maiming of Dallas Rice formed the basis of counts fifteen and sixteen, while the alleged conspiracy and attempted murder of Sheriff Fred Gaudet formed the basis of counts seventeen and eighteen. Count nineteen charged Ray with perjury before a federal grand jury in violation of 18 U.S.C. § 1623. Count twenty charged Eugene's daughter, Brenda Renee Depoy, with perjury before a federal grand jury in violation of 18 U.S.C. § 1623. Count twenty-one charged Eugene's other daughter, Christine Bennett Blagg, with perjury before a federal grand jury in violation of 18 U.S.C. § 1623. Count twenty-two charged Depoy with tampering with a witness in violation of 18 U.S.C. § 1512(b)(1). Count twenty-three charged Harmon John George with obstructing a criminal investigation in violation of 18 U.S.C. § 1510. Count twenty-four charged Eugene and Ray with obstruction of justice in violation of 18 U.S.C. § 1510.

On March 25, 1991, the case went to trial. At the close of all evidence, the district court dismissed count eight. The district court also dismissed counts one, twelve through fourteen, and twenty-four as they pertained to Ray. The jury found Eugene guilty of conducting a RICO enterprise (count one), RICO conspiracy (count two), arson resulting in death (count three), the use of fire to commit a felony (count four), six counts of mail fraud (counts five through seven and nine through eleven), two counts of violent crime in aid of racketeering (counts fifteen and sixteen), and obstruction of justice (count twenty-four). Eugene was acquitted of two counts of violent crime in aid of racketeering (counts seventeen and eighteen). In response to special interrogatories on count one, the jury found that Eugene participated in racketeering predicate acts one (arson of the Adrian property on January 1, 1980), two (arson of the Simmons' residence on May 26 and May 27, 1980), nine (conspiracy to commit and attempted murder of Dallas Rice), and twelve (the obstruction of a criminal investigation by Eugene on January 29, 1988). In response to special interrogatories on the RICO conspiracy count, the jury found that Eugene agreed to commit or agreed that another alleged coconspirator would commit predicate acts two, three (Arnold Dale Phillips' fire on May 8, 1983), four, nine, and twelve.

The jury found Ray guilty of RICO conspiracy (count two) and perjury (count nineteen).[10] In response to special interrogatories on the RICO conspiracy count, the jury found that Ray agreed to himself commit, or agreed that another alleged coconspirator would commit, predicate acts two (arson of the Simmons' residence on May 27),

10. Of the remaining defendants: Cyrus Jonathan George was severed from the appellants' trial and has not been tried; Harmon John George, Catherine Rice Bennett, and John William Riffle were acquitted of the charges pending against them. Depoy and Catherine Bennett Blagg pleaded guilty to perjury and testified at the appellants' trial.

five (Deever fire on July 2, 1984), and twelve (the obstruction of a criminal investigation by Ray on January 29, 1988).

The district court ordered the preparation of a presentence report for each defendant. On January 28, 1992, the district court sentenced Eugene to 262 months' imprisonment based upon an offense level of thirty-seven and a criminal history category one. The district court sentenced Ray to forty-eight months' imprisonment based upon an offense level of twenty-three and a criminal history category one.

Eugene and Ray filed timely notices of appeal to this court.

II

Appellants raise a variety of attacks on their convictions under RICO. All of these arguments have no merit, and only one merits discussion. Appellants argue that RICO's "pattern of racketeering" requirement is unconstitutionally vague because it fails to appraise the appellants that their alleged unlawful conduct violates the dictates of RICO.

The pertinent provisions of RICO provide:

§ **1962** ***Prohibited activities***

....

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

RICO makes it unlawful, among other things, for a person associated with an enterprise engaged in interstate commerce to "participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A "pattern of racketeering" is defined by § 1961(5) as:

> ... at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

Finally, RICO also makes it unlawful for a person to conspire to violate any of the provisions of, among other things, subsection (c) of § 1962. 18 U.S.C. § 1962(d).

A statute is unconstitutionally vague if it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). However, a statute is not unconstitutionally vague simply because potential uncertainty exists regarding the hypothetical reach of the statute in question. *United States v. Powell,* 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975) ("While doubts as to the applicability of the language in marginal fact situations may be conceived, we think that the statute gave respondent adequate warning that her mailing a 22-inch-long-sawed-off shotgun was a criminal offense."). But rather, vagueness challenges to statutes which do not implicate the First Amendment must be examined in light of the facts of each case. *Chapman v. United States,* — U.S. —, —, 111 S.Ct. 1919, 1929, 114 L.Ed.2d 524 (1991) ("First Amendment freedoms are not infringed by [the statute], so the vagueness claim must be evaluated as the statute is applied to the facts of this case."). In light of this precedent, we are called upon to determine whether RICO's "pattern of racketeering" element gives a person of ordinary intelligence notice that the charged multiple acts of arson and fraud against insurance companies constituted an unlawful "pattern of racketeering."

Prior to Justice Scalia's concurring opinion in *H.J. Inc. v. Northwestern Bell Telephone,* 492 U.S. 229, 238–39, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), we would have no trouble rejecting appellants' vagueness challenge. *See United States v. Dischner,* 974 F.2d 1502, 1508 (9th Cir.

1992) ("Vagueness challenges to RICO have been uniformly rejected by this circuit and every other circuit that has considered the issue.") (citations omitted). However, Justice Scalia's concurring opinion in *H.J. Inc.* has opened the floodgates to this once-settled issue. In *H.J. Inc.*, the Court adopted the so-called "continuity plus relationship" test for determining whether a "pattern of racketeering" exists. In adopting this approach that was alluded to in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), the Court held that in order to prove a "pattern of racketeering" activity the prosecutor must prove the existence of multiple racketeering predicates that "are related, and that ... amount to or pose a threat of continued criminal activity." 492 U.S. at 238–39, 109 S.Ct. at 2900.

The Court in *H.J. Inc.* initially noted that proof of relatedness and continuity will often overlap. The element of relatedness requires proof that the predicate acts of racketeering "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 492 U.S. at 240, 109 S.Ct. at 2901.

The Court had more difficulty defining the continuity requirement. The Court noted that the continuity requirement may be established where the related predicate-acts demonstrate continuity over a substantial period of time. *Id.* In reaching this conclusion, the Court noted: "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement...." *Id.* The Court also indicated that whether the predicate acts demonstrated a continued threat of continued activity depended upon the facts of each case. *Id.*, 492 U.S. at 241–43, 109 S.Ct. at 2902.

Justice Scalia, in a strongly-worded concurrence in judgment, noted:

> No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from the statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

*Id.*, 492 U.S. at 255–56, 109 S.Ct. at 2909 (Scalia, J., concurring in judgment) (dicta). Justice Scalia's comments in *H.J. Inc.* have breathed new life into the once ill-fated constitutional attacks marshalled against RICO.

To resolve this issue, we need look no further than to our sister circuits which have uniformly rejected vagueness challenges to RICO in the wake of the Court's decision in *H.J. Inc.* *See, e.g., Dischner*, 974 F.2d at 1509–11 (9th Cir.1992) (rejecting vagueness challenge to RICO statute despite Justice Scalia's comments to the contrary); *United States v. Glecier*, 923 F.2d 496, 497 n. 1 (7th Cir.) (same), *cert. denied*, — U.S. —, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir.) ("We have previously found that RICO was not unconstitutionally vague in a variety of applications, and we so find here, notwithstanding the comments in the concurring opinion in *H.J. Inc.*") (citations omitted), *cert. denied*, — U.S. —, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *United States v. Woods*, 915 F.2d 854, 862–64 (3d Cir.1990) ("Whatever might be true in other cases, 18 U.S.C. § 1962(c) is not unconstitutional when applied in this ongoing hardcore political corruption case."), *cert. denied*, — U.S. —, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); *United States v. Angiulo*, 897 F.2d 1169, 1178–80 (1st Cir.) (RICO not unconstitutional when applied to gambling, loansharking, and extortion operation headed by organized crime), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). We see no compelling reason not to join these circuits, and thus, reject appellants' vagueness challenge to RICO's "pattern of racketeering" requirement as applied in this case. While it may be contended that RICO is unconstitutionally vague in some contexts, a proposition in which we express no opinion, in this case the statute provided the appellants adequate notice that acts of arson, fraud, attempted murder (and other acts or threats of violence), perjury, and obstruction of justice committed with the

similar purpose—to allow the associated-in-fact enterprise to continue to defraud insurance companies—fell within those acts contemplated by a RICO enterprise and a RICO conspiracy to participate in the affairs of such an enterprise.

III

Eugene challenges the sufficiency of the evidence of his conviction on count three of the superseding indictment which charged him with aiding and abetting the malicious destruction of property affecting interstate commerce resulting in the death of any other person in violation of 18 U.S.C. §§ 2 and 844(i). Section 844(i) provides in pertinent part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, ... or other real property used in interstate ... commerce or in any activity affecting interstate ... commerce shall be imprisoned for not more than ten years or fined not more than $10,000 or both; ... and if death results to any person ... as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment....

At trial, it was incumbent upon the government to prove that Eugene: (1) aided and abetted the setting of a fire to destroy, or in an attempt to destroy, property; (2) that the property was used in or affected interstate commerce; (3) that the fire was set maliciously; and (4) that the destruction or attempted destruction of the property resulted in the death of any other person.

The evidence produced by the government was more than sufficient. At trial, the government produced evidence to show that Eugene purchased the Woodford property for $38,000 on November 9, 1979. At the time of the purchase, the property was being used as an Amoco station and a general store, and contained a residence as well. In 1981, Eugene closed the store and began converting portions of the property into rental units. On one occasion, Eugene showed Gerald Heater the hot water tank at the residence and explained to Heater that it would burn easily. Several weeks before the fire, Eugene discussed with Hubert Gregory the burning of the residence. After the fire occurred, Eugene told Donald Perrine that one of his boys set the fire.

The deceased girl's brother, Henry, came down the stairs and witnessed Eugene's son Lonnie remove the flexible line from the stove. The government also produced evidence that the remains of the stove and the line confirmed that the line was removed. Lonnie admitted that he had been in the main floor bathroom immediately before the fire but denies removing the line. Henry testified that he was ordered back upstairs by Lonnie. Henry also testified that he returned to his apartment where his sister Sally was sleeping and shortly thereafter began to smell smoke. Henry ran to safety, but Sally was unable to leave and died in the fire. Subsequently, Eugene collected approximately $63,000 in proceeds. In light most favorable to the government, this evidence is sufficient to sustain Eugene's conviction under count three. Fed.R.Crim.Proc. 29; *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

IV

While in custody awaiting trial, an eight-inch piece of mirror was found in Eugene's shoe, which he was apparently using as a means to view himself while combing his hair.

At trial, the following exchange took place on cross-examination between the prosecutor and Eugene:

Q. Have you ever obtained a weapon while you were in custody waiting on this trial?

A. I do not believe so.

Q. Wasn't an eight inch piece of broken glass found in your suit or shoes—

MR. REXROAD:—your Honor, I object to this kind of question for this hasn't been gone into before, and it is totally irrelevant to this trial.

MR. GOODWIN: I think it goes to his credibility, your Honor, as to escape

or plans for escape. Escape is evidence of guilty knowledge and goes to his credibility.

THE COURT: The objection is well taken and will be sustained and the jury will be instructed to disregard any references, comments or observations on that.

J.A. at 2835.

Eugene's attack is twofold. First, Eugene argues the question had no relevance and was thus improper. Second, despite the fact that the district court gave a curative instruction, Eugene argues that he was denied his right to a fair trial because it was disclosed to the jury that he was in custody.

In determining whether improper cross-examination by government counsel has so prejudiced the trial process as to require reversal, we apply a two-prong test. The defendant must demonstrate that: (1) the remarks or conduct were improper, and (2) the remarks prejudicially affected his rights so as to deprive him of a fair trial. *United States v. Hernandez,* 779 F.2d 456 (4th Cir.1985).

Eugene has satisfied the first prong. The question was clearly improper and fortunately was rebuked by the district court. The mirror was not being used as a weapon, nor was Eugene charged with such a crime. As to the prejudice prong, several factors are deemed relevant: "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." *United States v. Harrison,* 716 F.2d 1050, 1052 (4th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984).

Applying these factors, we conclude Eugene has not established prejudice. To the slightest degree, the comment prejudiced Eugene because it implied that he was in custody. However, in light of the nature of the comment and the district court's curative instruction, the prejudice was at best minimal. In addition, the comment was clearly isolated. The government never raised the matter again and did not refer to it in closing argument. As to the issue of strength of the government's case, as recounted in our factual summary of the case, it was strong indeed. The government's theory of the case was constructed around the testimony of seventy-five witnesses and was corroborated by documents and records. The government also introduced incriminating tape-recorded conversations. Finally, we do not believe that the comment was intended to divert the jury's attention to extraneous matters. In light of the isolatedness of the comment, the overwhelming evidence of guilt, and the district court's curative instruction, we hold that the comment did not prejudice Eugene to the extent that it deprived him of a fair trial.

## V

Ray contends that the government failed to prove that he intended to commit perjury before the grand jury in violation of 18 U.S.C. § 1623 (count nineteen of the superseding indictment) because he was unable to know whether his testimony was true or false due to insufficient mental capacity. The essential elements of making a false declaration before a grand jury are: (1) the defendant, while under oath, made one or more false declarations or answers as to matters about which he testified before a grand jury; (2) the defendant's testimony related to some material fact; and (3) the defendant knew the testimony was false. *United States v. Scop,* 940 F.2d 1004, 1011 (7th Cir.1991).

At trial, Ray presented the testimony of Michael Franzen, Ph.D., a neuropsychologist from West Virginia University School of Medicine. Dr. Franzen testified to Ray's limited memory, I.Q., communication, and cognitive skills. Dr. Franzen also testified that Ray tended to "confabulate" an answer when pressed for an answer which

his memory would not provide.[11] The government did not put its own expert on the stand to attack Dr. Franzen's testimony. Rather, the government rested on Ray's grand jury testimony where he never once testified that he could not remember, but specifically denied any involvement at all. J.A. at 2534–36.

It was up to the jury to determine whether Ray knew his grand jury testimony was false. The jury was entitled to rely on Ray's grand jury testimony in which no lack of memory could be inferred. *See United States v. Saunders,* 886 F.2d 56, 60 (4th Cir.1989) ("Given the lack of any real deficiency in the evidence, this court is bound by the 'credibility choices of the jury.' "). Under such circumstances, we conclude the evidence is sufficient to sustain Ray's conviction under count nineteen. Fed.R.Crim.Proc. 29; *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

## VI

Ray contends that the district court erred in sentencing him under the United States Sentencing Guidelines for his RICO conspiracy conviction, count two of the superseding indictment. Ray argues that the Guidelines do not apply to him because his overt acts were committed prior to the institution of the Guidelines. The government contends that Ray's membership in the conspiracy continued beyond the effective date of the Guidelines. Consequently, we are faced with another "straddle" issue under the Guidelines.

A defendant who participates in a conspiracy after the effective date of the Guidelines, November 1, 1987, is sentenced under the Guidelines. *United States v. Barsanti,* 943 F.2d 428 (4th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992); *United States v. Bakker,* 925 F.2d 728 (4th Cir.1991); *United States v. Meitinger,* 901 F.2d 27 (4th Cir.), *cert. denied,* 498 U.S. 985, 111 S.Ct. 519, 112 L.Ed.2d 531 (1990); *United States v. Sheffer,* 896 F.2d 842 (4th Cir.), *cert. denied,* 498 U.S. 968, 111 S.Ct. 432, 112 L.Ed.2d 416 (1990). To resolve whether the conspiracy charge before us straddled the effective date of the Guidelines, we must determine whether the conspiracy continued after the effective date of the Guidelines. *Bakker,* 925 F.2d at 739. "To determine if a conspiracy was 'carried on' beyond the effective date we examine whether the government introduced evidence at trial of a member of the conspiracy acting to further it after November 1, 1987." *Id.* (citations omitted). In the case before us, there is no question that the conspiracy was carried on before and after the effective date of the Guidelines. The issue that needs to be resolved is whether there is sufficient evidence in the record to support a finding that Ray's membership in the conspiracy continued after the effective date of the Guidelines. The resolution of this issue rests on whether Ray withdrew from the conspiracy prior to the effective date of the Guidelines.

Once it is proven that a defendant was a member of the conspiracy, the "defendant's membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action." *United States v. West,* 877 F.2d 281, 289 (4th Cir. 1989). To prove withdrawal, a defendant must provide evidence that he acted to defeat or disavow the conspiracy. *Id.* In the case *sub judice,* there was ample evidence in the record to demonstrate that Ray was involved in the conspiracy as late as October 29, 1987, when he committed perjury before the federal grand jury. Ray's perjury was clearly designed to conceal the culpability of himself and others. Because this perjury was committed just three days before the effective date of the

11. Dr. Franzen defined "confabulate" as:

> a technical term that means to make up an answer, as it were. For example, an individual when asked—you see this more frequently with people who have a memory impairment and have difficulty in admitting just how bad their memory really is. You give them a memory test, for example, a short story about a paragraph to remember. Then you ask them to repeat that back to you after five minutes have elapsed. And what they can't remember in the story, they will start to make [sic] up for you.

J.A. at 2879.

Guidelines and there is no evidence of withdrawal, the district court's finding that Ray's membership continued past the effective date of the Guidelines is not clearly erroneous.

Ray asserts that because the government conceded that the evidence was insufficient to convict him of obstruction of justice (the obstruction allegedly occurring in January 1988), he cannot be sentenced under the Guidelines. This argument is without merit. The government need not prove an overt act after the effective date of the Guidelines—the government need only prove that the conspiracy and appellant's membership continued (*e.g.,* no withdrawal) after the effective date of the Guidelines. *West,* 877 F.2d at 289. Accordingly, Ray was properly sentenced under the Guidelines.[12]

### VII

We find the additional assignments of error raised by the appellants to be without merit. Accordingly, for the reasons stated herein, we affirm Eugene's conviction and affirm Ray's conviction and sentence.

AFFIRMED.

---

12. On its face, Ray's argument also ignores cases that have held that an acquittal does not prevent the district court from finding by a preponderance of the evidence that the defendant engaged in such conduct. *See, e.g., United States v. Romulus,* 949 F.2d 713, 716–17 (4th Cir.1991) (acquitted conduct may be used in sentencing without placing the defendant in double jeopardy), *cert. denied,* — U.S. —, 112 S.Ct. 1690, 118 L.Ed.2d 403 (1992). However, because the evidence in the record appears to be insufficient to support a finding that Ray engaged in the conduct alleged in Act of Racketeering No. 12, we do not rest our decision that the Guidelines apply to Ray on the fact that he engaged in the conduct alleged in Act of Racketeering No. 12. Rather, as evidenced by Ray's perjury just three days before the effective date of the Guidelines, we rest our decision on Ray's failure to withdraw from the conspiracy before the effective date of the Guidelines.