998 F.2d 1011
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Aaron RATLIFF, Defendant-Appellant.
 No. 92-5485.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 11, 1993.
July 6, 1993.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, District Judge. (CR-91-97-MU)
 Argued: Harold Johnson Bender, Law Offices of Harold J. Bender, Charlotte, North Carolina, for Appellant.
 Patrice Pearlette Lewis, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.
 On Brief: Thomas J. Ashcraft, United States Attorney, Charlotte, North Carolina, for Appellee.
 W.D.N.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, and HAMILTON and LUTTIG, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 A jury convicted Aaron Ratliff (Ratliff) of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1); possession with intent to distribute cocaine base (crack), id.; and using or carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1). On appeal, Ratliff argues (1) there was insufficient evidence to support his conviction for using or carrying a firearm during and in relation to a drug trafficking crime, and (2) the district court abused its discretion in denying his motion for a mistrial because of the prosecutor's improper question on redirect examination of a witness. Finding no error, we affirm.
 
 
 2
 * On February 9, 1991, David Porter, at that time the Chief of Police for Morven, North Carolina, stopped Ratliff's vehicle for speeding. As Porter approached the vehicle, he detected the odor of alcohol. Porter asked Ratliff for his license and registration. As Ratliff was looking for these items, Porter observed a firearm on the passenger seat of the vehicle. Porter directed Ratliff to exit his vehicle in order to perform a field sobriety test. After Ratliff exited the vehicle, Porter secured the firearm and placed it on the roof of his patrol car. After conducting the field sobriety test, Porter asked Ratliff if he had any other firearms in the vehicle. Ratliff replied:"No. Do you want to look?" (Joint Appendix (J.A.) 17). Porter searched the vehicle and discovered an open bottle of whiskey in a box behind the driver's seat. Porter then arrested Ratliff for transporting an open bottle of spirituous liquor in the passenger area of a vehicle. During a search incident to arrest, Porter recovered a bag containing 29.7 grams of cocaine, eight baggies containing a total of 2.5 grams of crack, and $4,113 in cash.
 
 
 3
 After the defendant was arrested, he was advised of, and voluntarily waived, his Miranda[1] rights. In his statement, Ratliff gave the following rendition of the chain of events leading to his arrest: Prior to his arrest, he was at a night club in South Carolina. While he was in his vehicle in the parking lot of the night club, he was approached by a man and a woman who entered his car. The woman inquired whether he would sell an ounce of cocaine for her. He responded that he would. The woman then exited the vehicle, leaving himself and the man in the vehicle. Thereafter, he fell asleep while the man was still in his vehicle. When he awoke, the man was gone. He noticed that the man had left a quantity of cocaine which he placed in his sock. Then he went back to sleep. After he awoke, he drove back to North Carolina and was stopped for speeding. When asked where he acquired approximately $4,000 in cash, he stated some came from the sale of automobiles, but could not explain where the entire amount of money came from. He also stated that he had not sold drugs before, but admitted that he was going to start selling cocaine later that day.
 
 
 4
 A grand jury in the Western District of North Carolina indicted Ratliff on three counts. Count one charged Ratliff with possession with intent to distribute cocaine. 21 U.S.C. § 841(a)(1). Count two charged Ratliff with possession with intent to distribute crack. Id. Count three charged Ratliff with using or carrying a firearm during and in relation to a drug trafficking crime. 18 U.S.C. § 924(c)(1). The jury returned a verdict of guilty on each count of the indictment. The district court sentenced Ratliff to a term of thirty-three months' imprisonment on counts one and two and a consecutive sixty months' imprisonment on count three. Ratliff noted a timely appeal.
 
 II
 
 5
 Section 924(c)(1) states in pertinent part:
 
 
 6
 Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years....
 
 
 7
 Ratliff testified at trial that the firearm recovered from the passenger's seat of his vehicle was with him on February 9, 1991 because he normally carried a firearm. He also testified that he kept the firearm on the passenger seat, in other words in plain view, because he had previously called the Wadesboro Sheriff's Department and was informed that possessing a firearm was lawful so long as it was in plain view.[2] Based on these facts, Ratliff argues the government offered no evidence that he "used" or "carried" the firearm in question during and in relation to his drug trafficking offenses. We believe this argument is without merit.
 
 
 8
 In reviewing the district court's denial of the defendant's motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29, the standard of review is whether there is substantial evidence which, taken in the light most favorable to the government, would justify a verdict of guilty beyond a reasonable doubt by any rational trier of fact. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).
 
 
 9
 In United States v. Paz, 927 F.2d 176 (4th Cir. 1991), the police executed a search warrant at a residence. At the time of the search, Paz and another male were found in one bedroom, later determined to be Paz' bedroom. A bag containing 10.5 grams of cocaine and another bag containing 55.5 grams of crack were found in Paz' bedroom, as well as $1800 in a false spray can. Desiring to cooperate, Paz told the police there was a gun underneath the mattress. The police then retrieved a pistol from underneath the mattress. Paz was charged with and convicted of, among other things, a violation of 18 U.S.C. § 924(c)(1). Id. at 178. On appeal, Paz contended that the inaccessibility of the gun, placed under the mattress, established that he did not use the gun in relation to the crime. We rejected this contention by noting that "constructive possession of firearms in relation to a drug transaction is sufficient to establish 'use.' " Id. at 179 (citing United States v. Matra, 841 F.2d 837, 841-42 (8th Cir. 1988)). We also noted the weapon need not be brandished or displayed, but rather " 'it is enough if the firearm is present for protection and to facilitate the likelihood of success, whether or not it is actually used.' " Paz, 927 F.2d at 179 (citing United States v. Brockington, 849 F.2d 872, 876 (4th Cir. 1988)). We upheld the conviction on the basis that the firearm was present and accessible, even though under the mattress, and because its presence would certainly help facilitate the success of the criminal undertaking. Paz, 927 F.2d at 179.
 
 
 10
 Applying the reasoning in Paz to our case, the § 924(c)(1) conviction must be upheld. The gun in our case was present and accessible and there is little question that the presence of the gun would help facilitate the success of Ratliff's possession with intent to distribute cocaine and crack. See also United States v. Cummings, 937 F.2d 941, 943 (4th Cir.) (" '[E]vidence of weapons found with a significant quantity of illegal drugs and drug distributing paraphernalia' presents a jury question on a § 924(c)(1) charge.") (citation omitted), cert. denied, 112 S. Ct. 395 (1991). Accordingly, the district court did not err by denying Ratliff's Fed. R. Crim. P. 29 motion for judgment of acquittal on the charge of using or carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C.s 924(c)(1).
 
 III
 
 11
 Ratliff also argues that the district court erred in refusing to grant his motion for a mistrial based upon a question asked by the prosecution. Ratliff's argument is that by asking Special Agent Mark Isley whether, at the time of a subsequent arrest of Ratliff at his house, he had ever received information that Ratliff was selling drugs from his house, was so prejudicial that it warranted the granting of a mistrial.
 
 
 12
 On cross-examination, Ratliff's attorney had the following exchange with Special Agent Isley about a subsequent arrest of the defendant:
 
 
 13
 Q. Did somebody take money off Aaron Ratliff that day at his residence?
 
 
 14
 A. Sir, we took everything out of his pockets, but that was returned to him shortly thereafter.
 
 
 15
 Q. It was returned to him shortly after you placed a call to the Drug Enforcement Administration and they said they weren't going to mess around with little amounts of money; isn't that correct?
 
 
 16
 A. The money was always in his presence there when we got to the Anson County Sheriff's Department. After I made my telephone call referencing that amount of money, they said, "Well, it's not over a thousand dollars, so let him have his money."
 
 
 17
 Q. Well, was that found in close proximity to the drugs?
 
 
 18
 A. No, sir, it was not; not at the moment, no.
 
 
 19
 Q. Why would you at all seize that money off of him, whether it was in his pocket or not?
 
 
 20
 A. That money would be seized based on summation that an average individual may not carry a thousand dollars around with them on a daily basis-or six hundred dollars-and also due to the fact that previously we had located and seized a large amount of money from Mr. Ratliff two days prior. That was an inquiry with the Drug Enforcement Administration as far as that money was concerned.
 
 
 21
 Q. Does that mean that once you arrest a person, you can go back and seize this money any time you want to?
 
 
 22
 A. No, sir; that's not what it means. That money was transported with Mr. Ratliff to the Anson County Sheriff's Department on February 11. The money was-it was not seized from him.
 
 
 23
 Q. It was only returned to him after the DEA said they weren't interested; is that correct?
 
 
 24
 A. Yes, sir; that's correct.
 
 
 25
 Q. And would it not be ordinary to assume that somebody who had just been arrested for a serious offense that had been placed in custody would have to pay not only bond money but lawyers?
 
 
 26
 A. One could assume that.
 
 
 27
 (J.A. 117-18).
 
 
 28
 On redirect examination of Special Agent Isley, counsel for the government, asked the following question:
 
 
 29
 Q. I want to talk to you for a moment because Mr. Nixon has asked you about the $653. You inquired of the DEA whether or not you should seize that money from the defendant, didn't you?
 
 
 30
 A. That's correct.
 
 
 31
 Q. Had you ever gotten information that the defendant was selling drugs out of the house that you arrested him in at that time?
 
 
 32
 Counsel for Ratliff: Objection.
 
 
 33
 A. Yes, ma'am.
 
 
 34
 The Court: Sustained.
 
 
 35
 Counsel for Ratliff: Motion to strike. Move for a mistrial.
 
 
 36
 Counsel for the Government: Your Honor, the defendant opened the door by his line of questioning and I'm just trying to-
 
 
 37
 The Court: Not to that, he didn't. Motion to strike is allowed.
 
 
 38
 (J.A. 127-28).
 
 
 39
 Thereafter, the district court gave the jury an instruction to disregard Isley's answer. After the government called its final witness, the district court heard oral argument on Ratliff's motion for a mistrial. Counsel for Ratliff argued that the prejudicial effect of the question and Isley's answer warranted a mistrial. The government argued that because Ratliff's prior line of questioning implied that the government was being heavy handed in its consideration of a forfeiture of $653, the government should have been allowed to clear up any misconception created by demonstrating that there was in fact probable cause to seize and forfeit the $653 had the agents chosen to do so. The district court withheld its ruling on the motion until the following day. The district court denied the motion for mistrial. The district court stated:
 
 
 40
 With considerable reluctance, I will deny the motion for a mistrial. I don't mind telling the Government that I'm very queasy about denying the motion for a mistrial and feel that I may well be committing error. But in the context of all that has occurred in this trial up to this time, if I'm committing error, I believe it to be harmless. But with the testimony elicited, it cannot fail to be extremely prejudicial in the context of a case like this.
 
 
 41
 (J.A. 138-39).
 
 
 42
 In determining whether questioning by government counsel so prejudiced the trial process as to require a reversal, we apply a twoprong test. The defendant must demonstrate that: (1) the remarks or conduct were improper, and (2) the remarks prejudicially affected his rights so as to deprive him of a fair trial. United States v. Bennett, 984 F.2d 597, 608 (4th Cir.), cert. denied, 61 U.S.L.W. 3788 (U.S. May 24, 1993) (No. 92-8414). As to the prejudice prong, several factors are deemed relevant: " '(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.' " Id. (citing United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied, 466 U.S. 972 (1984)).
 
 
 43
 As to the first prong, we believe the question was improper. Eliciting evidence that is not relevant and prejudicial can place an otherwise well-tried case in jeopardy. As to the prejudice prong, only factor one appears to favor Ratliff, that is, the question had the tendency to mislead the jury. However, in light of the nature of the comment and the district court's curative instruction, the prejudice was at best minimal. In this case, the question was isolated and not extensive and the strength of the government's case was overwhelming, if not insurmountable. As to factor four, because the government believed that Ratliff had opened the door by asking questions which were designed to make it look heavy handed, the government was not attempting to divert the jury's attention to extraneous matters, but rather the government was merely attempting to clear up the misconception it perceived was created by the defense. In summary, in light of the isolatedness of the question, the overwhelming evidence of guilt, and the curative instruction, which the jury is presumed to have followed, Greer v. Miller, 483 U.S. 756, 766 n.8 (1987), the prosecutor's question did not prejudice Ratliff to the extent that it deprived him of a fair trial. Accordingly, the district court's denial of Ratliff's motion for a mistrial was not an abuse of discretion.[3]
 
 IV
 
 44
 For the reasons stated herein, the judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 Miranda v. Arizona, 384 U.S. 436 (1966)
 
 
 [2]
 In fact, six or seven months prior to the February 9, 1991 stop, Chief Porter examined, with Ratliff's consent, the same pistol to determine whether it was stolen
 
 
 [3]
 We also note that any error with respect to the improper question was, in light of the overwhelming evidence of guilt, harmless beyond a reasonable doubt