**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 19-4123**

---

UNITED STATES OF AMERICA,

>            Plaintiff – Appellee,

> v.

MONTANA BARRONETTE,

>            Defendant – Appellant.

---

**No. 19-4160**

---

UNITED STATES OF AMERICA,

>            Plaintiff – Appellee,

> v.

BRANDON WILSON, a/k/a Ali,

>            Defendant – Appellant.

---

**No. 19-4180**

---

UNITED STATES OF AMERICA,

>            Plaintiff – Appellee,

> v.

JOHN HARRISON, a/k/a Binkie,

>            Defendant – Appellant.

**No. 19-4181**

UNITED STATES OF AMERICA,

              Plaintiff – Appellee,

      v.

LINTON BROUGHTON, a/k/a Marty,

              Defendant – Appellant.

**No. 19-4328**

UNITED STATES OF AMERICA,

              Plaintiff – Appellee,

      v.

TERRELL SIVELLS,

              Defendant – Appellant.

**No. 19-4408**

UNITED STATES OF AMERICA,

              Plaintiff – Appellee,

      v.

TAURUS TILLMAN,

              Defendant – Appellant.

2

—————————

**No. 19-4562**

—————————

UNITED STATES OF AMERICA,

             Plaintiff – Appellee,

     v.

TIMOTHY FLOYD, a/k/a Tom Rod,

             Defendant – Appellant.

—————————

**No. 19-4726**

—————————

UNITED STATES OF AMERICA,

             Plaintiff – Appellee,

     v.

DENNIS PULLEY, a/k/a Denmo,

             Defendant - Appellant.

—————————

Appeals from the United States District Court for the District of Maryland, at Baltimore. Catherine C. Blake, Senior District Judge. (1:16-cr-00597-CCB-1; 1:16-cr-00597-CCB-10; 1:16-cr-00597-CCB-6; 1:16-cr-00597-CCB-7; 1:16-cr-00597-CCB-2; 1:16-cr-00597-CCB-3; 1:16-cr-00597-CCB-12; 1:16-cr-00597-CCB-8)

—————————

Argued: May 4, 2022                            Decided: August 18, 2022

—————————

Before NIEMEYER and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge.

—————————

Nos. 19-4123, 19-4160, 19-4180, 19-4181, 19-4328, 19-4408, and 19-4562, affirmed; No. 19-4726, affirmed in part, reversed in part, and remanded for further proceedings by

3

published opinion.   Senior Judge Floyd wrote the opinion in which Judge Niemeyer and Judge Diaz joined.

———————————————

**ARGUED:** Steven M. Klepper, KRAMON & GRAHAM, PA, Baltimore, Maryland; Alfred Guillaume, III, LAW OFFICE OF ALFRED GUILLAUME III, Washington, D.C., for Appellants. Jason Daniel Medinger, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael Lawlor, BRENNAN MCKENNA & LAWLOR, Greenbelt, Maryland, for Appellant Montana Barronette. Christopher C. Nieto, NIETO LAW OFFICE, Baltimore, Maryland, for Appellant Brandon Wilson. Jenifer Wicks, BLIND JUSTICE LEGAL SERVICES, Takoma Park, Maryland, for John Harrison. Stuart A. Berman, LERCH, EARLY & BREWER, CHTD., Bethesda, Maryland, for Appellant Terrell Sivells. Erek L. Barron, WHITEFORD, TAYLOR & PRESTON LLP, Rockville, Maryland, for Appellant Dennis Pulley. Richard B. Bardos, SCHULMAN, HERSHFIELD & GILDEN, P.A., Baltimore, Maryland, for Appellant Taurus Tillman. Gerald C. Ruter, LAW OFFICES OF GERALD C. RUTER, PC, Baltimore, Maryland, for Appellant Timothy Floyd. Jonathan F. Lenzner, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

———————————————

4

FLOYD, Senior Circuit Judge:

Appellants Montana Barronette, Brandon Wilson, Linton Broughton, John Harrison, Terrell Sivells, Taurus Tillman, Timothy Floyd, and Dennis Pulley (collectively, Appellants) operated for around seven years an enterprise known as "Trained to Go" (TTG) within one of West Baltimore's neighborhoods. Appellants distributed drugs and engaged in countless acts of violence using firearms. They exercised their constitutional right to a jury trial and were convicted for their actions, including for conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO). They now bring numerous challenges to their convictions and sentences, including their right to a public trial, the evidence admitted at trial, and more. We affirm Appellants' convictions and sentences on all fronts, save one. We reverse Pulley's § 922(g)(1) conviction, vacate the judgment as to him, and remand for further proceedings consistent with our opinion.

I.

A.

Evidence at trial, viewed in the light most favorable to the government, *United States v. Burgos*, 94 F.3d 849, 854 (4th Cir. 1996) (en banc), showed the following. From about 2010 to 2017, Appellants operated TTG in the Sandtown neighborhood of West Baltimore. Barronette and Sivells served as leaders. Over the course of seven years, Appellants and TTG distributed heroin, cocaine, marijuana, and other controlled substances. In addition to distributing drugs, the organization's members, including Appellants, engaged in violent acts using firearms, including murder, kidnapping, and

5

assault. Other criminal organizations, including a group known as "Young Go Getters" (YGG) solicited TTG members and associates to engage in murder-for-hire schemes. Appellants, in varying capacities, were connected to the murders of Brian Chase, Marquez Jones, Lamont Randall, Gerald Thompson, Jacqueline Parker, Domonique Harris, Antonio Addison, and Christopher Pennington. The government also introduced evidence at trial of TTG's unfulfilled plans to murder others.

Law enforcement began surveilling TTG, using informants to conduct controlled buys, and acquiring warrants to wiretap TTG members' phones. On February 5, 2016, a tracking order was issued for a cellular phone used by Sivells and referred to as TT4. A wiretap order issued for that phone on March 3, 2016. On April 5, 2016, the government filed an application for a warrant authorizing the interception of wire communications to and from another cellular telephone used by Sivells and referred to as TT5. The wiretap calls showed Appellants communicating to distribute drugs and to track people who they were conspiring to murder. During the course of surveillance, officers observed Barronette and Sivells conducting drug transactions. Law enforcement also conducted controlled purchases of drugs from the group. In light of this surveillance, police acquired search and seizure warrants for a variety of addresses connected to Appellants, including a warrant issued on August 4, 2016, for a search of the premises at 2307 Avalon Street in Baltimore.

## B.

On June 29, 2017, a grand jury in the District of Maryland returned a superseding indictment containing RICO conspiracy and other charges against Barronette, Wilson,

Harrison, Broughton, Sivells, Tillman, Floyd, and Pulley.  On June 7, 2018, the grand jury returned a second superseding indictment.

Count One charged all Appellants with conspiring to violate RICO, 18 U.S.C. § 1962(d), for their actions as TTG members.  The government alleged that Appellants conspired to sell heroin, cocaine, and marijuana and to enrich and protect themselves and TTG through murder, assault, robbery, kidnapping, and other acts of violence.  The indictment listed predicate offenses as murder, attempted murder, and conspiracy to commit murder under Maryland law; murder-for-hire under 18 U.S.C. § 1958; witness tampering and retaliation under 18 U.S.C. §§ 1512 & 1513; conspiracy to distribute and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841; and robbery and robbery conspiracy under the Hobbs Act, 18 U.S.C. § 1951, and Maryland law.  Count One set forth twenty-one overt acts, including drug sales and murders.

Count Two charged Barronette and Harrison with murdering three individuals to maintain and increase their positions in TTG, in violation of 18 U.S.C. § 1959(a)(1).[1]

Count Three charged all Appellants with a narcotics conspiracy, from 2010 through the date of the original indictment in January 2017, involving one kilogram or more of heroin, as well as cocaine and marijuana, in violation of 21 U.S.C. § 846.

---

[1] The government dismissed Count Two on the first day of the trial.

7

Counts Four, Five, and Six charged Sivells and Tillman with possession with intent to distribute heroin on specific dates in 2016, in violation of 21 U.S.C. §§ 841 and 18 U.S.C. § 2.

Counts Seven, Eight, Nine, and Ten charged Wilson and Pulley with possessing firearms in furtherance of the narcotics distribution conspiracy, in violation of 18 U.S.C. § 924(c), and while having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g).

The district court denied Appellants' pretrial motions to dismiss the RICO conspiracy charge and to suppress evidence and statements obtained through electronic surveillance and law enforcement interrogation.

The jury trial commenced on September 17, 2018. Ten days into the trial, the district court advised counsel that it would authorize the marshals to limit the number of spectators in the courtroom to twenty-five people if the marshals had security concerns and that additional spectators would be sent to an overflow room. The district court overruled Harrison and Tillman's objections to this, citing "extremely serious security concerns," J.A. 1109.2, including fights in the gallery, knives being found in the gallery, a table in the lobby of the courtroom being vandalized with TTG's name, the fact that government witnesses in the case had been murdered, and an alleged request from Barronette while imprisoned for people to pack the courtroom when government witnesses were testifying.

After twenty-six days of trial, the jury convicted Appellants on all charges. The jury also issued special verdicts. It found that Barronette conspired to commit the murders of Brian Chase, Marquez Jones, Lamont Randall, Gerald Thompson, Jacqueline Parker,

8

Antonio Addison, and an unknown individual. However, the jury declined to find that Barronette conspired to commit one murder—that of David Moore. The jury returned a special verdict that Sivells conspired to commit the murder of Antonio Addison. It found that Harrison conspired to commit the murders of Brian Chase, Lamont Randall, Gerald Thompson, Jacqueline Parker, and Dominique Harris. The jury returned a special verdict that Broughton conspired to commit the murder of an unknown individual. It found that Pulley conspired to commit the murder of Christopher Pennington. The jury returned a special verdict that Floyd conspired to commit the murder of Antonio Addison. On the narcotics conspiracy charge, the jury found that 1,000 grams or more of heroin, along with quantities of cocaine and marijuana, were foreseeable to all Appellants.

On February 15, 2019, Barronette received a sentence of concurrent terms of life imprisonment on Counts One and Three, concurrent five-year terms of supervised release, and a $200 special assessment.

On March 7, 2019, the district court sentenced Wilson to concurrent terms of 240 months' (Counts One and Three) and 120 months' (Count Eight) imprisonment, and a 60-month consecutive term of imprisonment (Count Seven), concurrent five-year (Counts One and Three) and three-year (Counts Seven and Eight) terms of supervised release, and a $400 special assessment.

On March 15, 2019, Broughton was sentenced to concurrent terms of 360 months' imprisonment on Counts One and Three, concurrent five-year terms of supervised release, and a $200 special assessment.

9

Also on March 15, 2019, the district court sentenced to Harrison to concurrent terms of life imprisonment on Counts One and Three, concurrent five-year terms of supervised release, and a $200 special assessment.

On April 26, 2019, Sivells was sentenced to concurrent terms of imprisonment of life (Counts One and Three) and 30 years (Count Four), concurrent terms of supervised release of five years (Count One), ten years (Count Three), and six years (Count Four), and a $300 special assessment.

On May 23, 2019, the district court sentenced Tillman to concurrent terms of 300 months' (Counts One and Three) and 240 months' (Counts Five and Six) imprisonment, concurrent five-years terms of supervised release, and a $400 special assessment.

On July 19, 2019, Floyd received a sentence of concurrent terms of 360 months' imprisonment (Counts One and Three), concurrent five-year terms of supervised release, and a $200 special assessment.

On September 20, 2019, the district court sentenced Pulley to concurrent terms of 360 months' (Counts One and Three) and 120 months' (Count Ten) imprisonment, and a 60-month consecutive term of imprisonment (Count Nine), concurrent five-year (Counts One, Three, and Nine) and three-year (Count Ten) terms of supervised release, and a $400 special assessment.

## C.

Appellants bring fifteen claims on appeal. All contest that the district court erred in refusing to dismiss the RICO conspiracy charge in Count One on grounds that the RICO

10

conspiracy statute is unconstitutionally vague.  They also all claim that the district court

violated their right to a public trial, and that there was insufficient evidence in support of

Count One and that the drug conspiracy involved one kilogram or more of heroin.

Sivells and Floyd claim the district court erred in denying their motions to suppress

evidence gathered from electronic surveillance and that there was insufficient evidence for

the jury's special verdict that they conspired to murder Antonio Addison.  Sivells also

contests the denial of his motion to suppress statements made to law enforcement after his

arrest.

Wilson and Pulley contend that their sentences under 18 U.S.C § 922(g)(1) should

be vacated in light of *Rehaif v. United States*, 139 S. Ct. 2191 (2019).  Wilson separately

contends there was insufficient evidence that he possessed a firearm in furtherance of a

drug conspiracy.

Barronette and Pulley assert that the district court abused its discretion in denying

their motion for a mistrial based on prejudicial witness testimony.

Broughton argues there was insufficient evidence for the special verdict that he

conspired to murder unknown individuals.

Finally, Sivells, Broughton, and Floyd assert that their sentences are procedurally

and substantively unreasonable.

We reject all of these claims except that we agree with Pulley that his conviction

under § 922(g)(1) should be vacated under *Rehaif*.

11

II.

We begin with Appellants' argument that the district court erred in refusing to dismiss the RICO conspiracy charge in Count One because the RICO conspiracy statute is unconstitutionally vague in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). We reject Appellants' argument as we have already upheld the constitutionality of the RICO conspiracy statute, and *Davis* does not disturb our ruling.

We review vagueness challenges de novo. *United States v. Sun*, 278 F.3d 302, 308 (4th Cir. 2002). "A statute is unconstitutionally vague if it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" *United States v. Bennett*, 984 F.2d 597, 605 (4th Cir. 1993) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). Thus, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "We consider whether a statute is vague as applied to the particular facts at issue, for 'a [defendant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010) (brackets omitted) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)).

Appellants argue that the phrases "pattern of racketeering activity" and "enterprise" are unconstitutionally vague. Appellants are not the first to bring a vagueness challenge against the RICO conspiracy statute. In a concurrence in *H.J. Inc. v. Northwestern Bell*

12

*Telephone Co.*, which adopted a new test for finding a "pattern of racketeering," Justice

Scalia contemplated such a challenge to the RICO conspiracy statute:

> No constitutional challenge to this law has been raised in the present case, and so that issue is not before us. That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when that challenge is presented.

492 U.S. 229, 255–56 (1989) (Scalia, J., concurring in the judgment).

Nevertheless, since *H.J. Inc.*, and despite Justice Scalia's skepticism, we have twice

rejected void-for-vagueness challenges to the RICO statute. *See Bennett*, 984 F.2d at 605–

07; *United States v. Borromeo*, 954 F.2d 245, 248 (1992). So have our sister circuits. *See*

*Bennett*, 984 F.2d at 606 (collecting cases). In *Borromeo*, we declined to accept Justice

Scalia's position in *H.J. Inc.* "that the phrase 'pattern of racketeering activity' was

unconstitutionally vague since a majority of the Supreme Court . . . implicitly rejected that

suggestion." 954 F.2d at 248.

Appellants acknowledge that line of decisions but ask us to reconsider it in light of

void-for-vagueness cases like *Davis*, *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and

*Johnson v. United States*, 576 U.S. 591 (2015). But none of those cases justifies such

reconsideration, as they focus only on the residual "crime of violence" or "residual clause"

definitions in 18 U.S.C. § 924(c), the Immigration and Nationality Act, and the Armed

Career Criminal Act, respectively. Those definitions do not appear in the RICO conspiracy

statute.

In *Johnson*, the Court invalidated the "residual clause" of the Armed Career

Criminal Act (ACCA), which defined a violent felony, in part, as a crime that "otherwise

13

involves conduct that presents a serious potential risk of physical injury to another." 576 U.S. at 594, 606 (emphasis omitted) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). Next, in *Dimaya*, the Court held that a similar residual clause defining a crime of violence as "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" was likewise unconstitutionally vague. 138 S. Ct. at 1211, 1223 (quoting 18 U.S.C. § 16(b)). Finally, in *Davis*, the Court applied *Johnson* to strike down a residual clause that defined violent felonies as felonies "that by their nature, involve a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 139 S. Ct. at 2323–24 (brackets omitted) (quoting 18 U.S.C. § 924(c)(3)(B)).

We thus disagree that *Bennett* has been effectively overruled. Appellants challenge different language that we have upheld as constitutional. *Bennett*, 984 F.2d at 605–07. We are bound by this precedent. *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc). We will follow our previous holdings and affirm that the RICO conspiracy statute is not unconstitutionally vague, rejecting Appellants' first claim on appeal.

III.

Appellants next contend that the district court violated their Sixth Amendment rights to a public trial when it limited the number of people who could gather in the public gallery to twenty-five people, even though the courtroom could hold well over a hundred. A district court's decision to limit access to a courtroom proceeding is a constitutional

14

question we review de novo. *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995). We disagree that Appellants' rights to a public trial were violated.

## A.

Ten days into Appellants' trial, the district court implemented a partial reduction of the courtroom's capacity after several incidents that raised security concerns. The district court advised counsel that it would authorize the marshals to limit the number of spectators in the gallery to twenty-five people if they became concerned about the number of people for security reasons and that additional observers would be diverted to an overflow room. Harrison and Tillman's counsel objected that members of the public would not be able to physically see the proceedings but could only hear them. The district court overruled those objections because of "the extremely serious security concerns that this trial is raising [which is] why I feel the necessity to do that." J.A. 1109.2.

The next day, the district court provided more specific reasons for the partial closure. It emphasized that the case involved approximately a dozen murders; two witnesses for the government were murdered, "at least plausibly in connection with this case;" two defendants assaulted marshals when being taken out of the courtroom; there was a physical fight in the gallery on the second day of trial; a number of verbal outbursts came from the gallery; a spectator was found in the gallery with a knife; a table in the lobby of the courtroom had been vandalized with the name of the TTG gang scratched into it in several places; and Barronette allegedly made a call while imprisoned that had "a plausible interpretation of a request to pack the courtroom" when cooperating witnesses were

15

testifying, "rais[ing] the possibility of intimidation of those witnesses." J.A. 1129–31. Spectators in the overflow room could hear audio, but "the video [was] limited to . . . that seal above the bench." J.A. 1131.

On October 8, 2018, Harrison moved for a mistrial, noting that on two occasions, marshals did not allow a spectator to go to the overflow room and instead asked to them leave the courthouse. Affidavits from spectators were included in the motion. Three days later, Harrison submitted another affidavit stating that on October 11, 2020, a marshal told a spectator that the courtroom was "at capacity" and there was no "clearance" to open another courtroom. J.A. 1819. That spectator waited outside the courtroom and was admitted after the mid-afternoon break. The district court did not rule on Harrison's motion, effectively denying it.

## B.

The Sixth Amendment guarantees a defendant the right to a public trial. *Gannett Co. v. DePasquale*, 443 U.S. 368, 379–81 (1979). "The central aim of a criminal proceeding must be to try the accused fairly, and '[the Court's] cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant.'" *Waller v. Georgia*, 467 U.S. 39, 46 (1984) (quoting *Gannett*, 443 U.S. at 380). "[T]he public-trial guarantee embodies a view of human nature, true as a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings." *Estes v. Texas*, 381 U.S. 532, 588 (1965) (Harlan, J., concurring). "[T]he Sixth Amendment public-trial right 'is for the benefit of

16

the accused,' ensuring 'that the public may see he is fairly dealt with and not unjustly condemned . . . [and] keep[ing] his triers keenly alive to a sense of their responsibility.'" *United States v. Mallory*, No. 19-4385, 2022 WL 2662050, at *6 (4th Cir. July 11, 2022) (quoting *Waller*, 467 U.S. at 44-46).

"Yet the right is not absolute, and the Supreme Court has long recognized that trial judges have discretion to impose *reasonable limitations* on access to a trial when overriding interests . . . are likely to go unprotected if closure is not employed." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc) (emphasis added). We use the Supreme Court's test from *Waller* to determine if "the right to public trial may give way," which requires that:

> (1) the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced, (2) the closure is no broader than necessary to protect that interest, (3) reasonable alternatives to closing the proceeding [were] considered by the trial court, and (4) findings adequate to support the closure [were] made by the trial court.

*Id.* at 166 (citing *Waller*, 467 U.S. at 48).

*Waller* involved a *total closure* of a suppression hearing, from which all members of the public were excluded. 467 U.S. at 42. Although we have not articulated a clear rule for a *partial* closure of a courtroom, the Second, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits have applied a less stringent test in such circumstances. *See Osborne*, 68 F.3d at 99 n.12 (collecting cases). These circuits have concluded that

> "when a trial judge orders a partial, as opposed to a total, closure of a court proceeding at the request of one party, a 'substantial reason' rather than *Waller*'s 'overriding interest' will justify the closure," because a partial closure does not "implicate the same secrecy and fairness concerns that a total closure does."

17

*United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994) (quoting *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992)). [2]

Here, the courtroom was never completely closed to the public; the district court only reduced the capacity for spectators. Thus, it appears that applying the out-of-circuit, less stringent test would be appropriate in this situation. However, we need not reach that question today, as we believe the district court's decision to partially reduce the capacity of the courtroom holds up under the original *Waller* factors.

Regarding the first *Waller* prong, neither party seems to have requested the capacity limit; instead, either the marshals or the district court itself requested the number of spectators be capped due to security concerns and to prevent witness intimidation. Maintaining order is an overriding interest. *See, e.g.*, *Codispoti v. Pennsylvania*, 418 U.S. 506, 514 (1974) ("[C]ases in this Court have consistently [recognized] 'the need to maintain order and a deliberative atmosphere in the courtroom.'" (quoting *Bloom v. Illinois*, 391 U.S. 194, 210 (1968))). As is preventing witness intimidation. *Tucker v. Superintendent Graterford SCI*, 677 F. App'x 768, 777 (3d Cir. 2017). We believe the district court advanced overriding interests of maintaining order and preventing witness intimidation by ordering the partial closure.

---

[2] We discussed the "substantial reason" test employed by other circuits for partial closures in *Bell*. *See* 236 F.3d at 168 n.11 (collecting cases). But we did not decide if we would join our sister circuits in applying that test. *See id.*

18

As to the second prong, the partial reduction in capacity was no broader than necessary. The district court chose to cap the audience at twenty-five people after consulting both courthouse security and defense counsel. It explained that twenty-five people was "a number of the general public equivalent to what the defense counsel proffered there had normally been." J.A. 1131. And the capacity reduction was also "based on marshals' advice." J.A. 1131. Further, the court set up an overflow room for spectators once the number of spectators in the courtroom reached the capacity limit.

We find that the capacity restriction was "tailored to serve" the interest of security and preventing witness intimidation. *Bell*, 236 F.3d at 168. The courtroom was not "unnecessarily restricted," *id.*, as many members of the public were still able to attend. There "was no *literal* closure of the courtroom." *Mallory*, 2022 WL 2662050, at *7. Indeed, in addition to the jury, the "[c]ourt personnel, the attorneys, and the court reporter remained, and, of course, the jury, comprised of the public, was present." *Id.* In this case, additional members of the public were present, as well, as twenty-five spectators were able to attend. Thus, we hold that the restriction was no broader than necessary.

Third, we find that the district court both considered and implemented reasonable alternatives to closing the courtroom. *Id.* at 169 ("*Waller* counsels trial courts to consider alternatives to a complete closure of a public proceeding."). Despite serious security concerns, the court did not close the courtroom but instead instituted a capacity limit after consulting courthouse security and defense counsel. *See id.* ("the limited nature of the closure . . . suggests that [the court] considered" alternatives). It also set up an overflow

19

room that provided live audio of the proceedings.  Thus, we find that the district court's process satisfies the third *Waller* prong.

Finally, we find that the district court made adequate factual findings to support the capacity limitation.  The court did not institute the partial closure until ten days into trial, and after several disturbances had occurred.  The court listed several instances of "extremely serious security concerns," J.A. 1109.2, including a fight in the gallery, a spectator bringing a knife to the gallery, a courthouse table being vandalized with TTG's name, the murders of two cooperating witnesses, and Barronette's alleged request for people to pack the courtroom when cooperating witnesses were testifying.  The court made "'findings specific enough that a reviewing court can determine whether the closure was properly entered.'"  *Waller*, 467 U.S. at 45 (quoting *Press Enter. Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 510 (1984)).  Thus, we find the district court satisfied this prong.

In sum, we find that the district court's order to reduce the courtroom's capacity satisfies the *Waller* factors.  Appellants did not have a trial in secret.  While some spectators who wanted to be in the courtroom were not able to be there, Appellants still received the benefits of having a public trial as twenty-five spectators were able to be in the courtroom.  "[T]he partial closing of court proceedings does not raise the same constitutional concerns as a total closure because an audience remains to ensure the fairness of the proceedings."  *Osborne*, 68 F.3d at 98–99.  We hold that the district court did not violate Appellants' rights to a public trial.

20

IV.

Next, Sivells and Floyd appeal the court's denial of their motions to suppress. Sivells moved to suppress evidence gathered from tracking orders and wiretap orders on two phones he was utilizing during the drug conspiracy, referred to as TT4 and TT5.  He also moved to suppress the search warrant for 2307 Avalon Avenue in Baltimore, which relied on supporting affidavits using information derived from TT4.  Floyd, whose voice was intercepted on the TT4 wiretap, also moved to suppress all evidence collected through the use of electronic surveillance.  The district court denied the motions, finding there was adequate probable cause for the orders.  J.A. 563, 734.  We affirm.

When reviewing a district court's denial of a motion to suppress, we review legal conclusions de novo and any factual determinations only for clear error.  *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010).  If the district court denies the motion to suppress, we view all facts in the light most favorable to the government.  *Id.*  The reviewing court's duty is only to ensure that the issuing court "had a 'substantial basis for concluding' that a search would uncover evidence of wrongdoing."  *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (cleaned up) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Regarding the tracking order for TT4, a federal magistrate judge issued a search warrant on February 5, 2016, permitting the government to receive location information from the phone.  An eleven-page affidavit accompanied the warrant, establishing probable cause that Sivells was involved in drug trafficking and that the phone was used for drug trafficking.  The affidavit detailed that (1) a confidential informant (CS-4) indicated that Barronette was engaged in heroin trafficking in the area of North Carrollton Street and

21

Riggs Avenue in Baltimore; (2) law enforcement observed Sivells overseeing the distribution of drugs in that area; (3) CS-4 made a controlled purchase of heroin from Barronette; (4) on January 23, 2016, an intercepted call, involving another cellphone that the police were tracking, revealed Barronette and Sivells discussing guns and drugs; (5) in February 2016, CS-4 indicated that Sivells had recently acquired TT4 and was using the phone to facilitate drug deals; and (6) also in February 2016, CS-4 made a controlled call to Sivells on TT4 and made a deal with Sivells to purchase cocaine, with Sivells directing CS-4 to go to a drug shop on Calhoun Street.

For the subsequent wiretap of TT4, the government submitted a fifty-two-page affidavit describing probable cause, which included all of the above facts plus details about Sivells's record of drug crimes and phone records showing that TT4 was routinely used to call Barronette, another known drug dealer.

For the wiretap of TT5, another cellphone associated with Sivells, law enforcement submitted a seventy-five-page affidavit detailing probable cause. The affidavit stated that in early March 2016, CS-4 informed police that Barronette and Sivells were using TT5 as their phone to arrange drug transactions. The affidavit also listed who made controlled calls to TT5 that Sivells answered, indicating he was going to purchase drugs.

Finally, for the search warrant for the residence at 2307 Avalon Avenue, the government included an affidavit detailing controlled purchases of heroin from Barronette and Sivells in November 2015 and January 2016, physical and electronic surveillance of Sivells at or near the residence, and information from CS-4 that Sivells was recently in the residence.

Appellants want us to discredit some of the information in the affidavits that came from officers who were in the Baltimore City Police Department's Gun Trace Task Force (GTTF).  Seven of these officers were convicted of racketeering conspiracy and other offenses for abusing their positions.  Three of these officers arrested Broughton on January 22, 2016, and in their affidavits establishing probable cause for the tracking order and wiretap order on TT4, the government relied on events related to Broughton's arrest.  Appellants want us to disregard the evidence in the affidavits from those events.  However, they admit "there are no allegations of misconduct against the agents and officers who investigated the present case."  Opening Br. 22.

Appellants do not offer any evidence, for example, that Broughton's arrest was tainted by any of the officers' unlawful activity.  They also cite no legal authority for their assertion that we should disregard the evidence.  Additionally, the officers' version of the events was corroborated by an intercepted phone call on January 23, 2016, over TT3, another cellphone, between Barronette and Sivells, in which the two discussed what occurred during the arrest.  And even if we disregarded any mention of the discredited officers in the affidavits, the remaining information still supports a probable-cause finding for the TT4 warrant.  Thus, we need not decide whether any of the evidence from the GTTF officers needs to be disregarded, as we can find that there was sufficient probable cause supporting the tracking order and wiretap of TT4.  *See United States v. Fall*, 955 F.3d 363, 371–72 (4th Cir. 2020) ("The case law establishes that, even if an affidavit supporting a search warrant is based in part on some illegal evidence, such inclusion of illegal evidence

23

does not taint the entire warrant if it is otherwise properly supported by probable cause." (brackets and citation omitted)).

In sum, we find there is ample probable cause supporting the tracking and wiretap orders for TT4 and TT5, as well as the search warrant for 2307 Avalon Avenue. We affirm the district court's denial of the motions to suppress.

V.

Next, Sivells challenges the admission of statements he made to law enforcement after his arrest on October 27, 2016. He contends that officers improperly continued questioning him after he invoked his right to counsel. He filed a motion to suppress the statements, which the district court denied. We affirm the denial of the motion to suppress.

As above, we review legal conclusions de novo and any factual determinations only for clear error. *Kelly*, 592 F.3d at 589. Because the district court denied Sivells's motion, we view the facts in the light most favorable to the government. *Id.*

After arresting Sivells, Detective Neptune and FBI Task Force Member Delorenzo took him to an interview room where Neptune advised Sivells of his *Miranda* rights using a Baltimore Police Department explanation and waiver of rights form. Sivells signed the form, confirming that he understood his rights. Sivells centers his claim on a portion of the video of the interrogation, which shows Sivells saying, at one point, "I can't use my cell phone to call my attorney." J.A. 663. Neptune testified that he interpreted this as Sivells "ask[ing] if he could use his cell phone to call his attorney." J.A. 663. Neptune "explained to him that if he wanted to have an attorney present, that we wouldn't call an

24

attorney down there for him.  If he wanted to have an attorney present during questioning, we would stop right now, and we would speak to him at a later date with his attorney." J.A. 664.  Neptune testified that after that conversation, Sivells went back to reading his rights and initialing the form.  Neptune continued to converse with Sivells, and later testified at trial about Sivells's statements.

The district court watched the video and held a hearing on Sivells's motion to suppress the statements.  The court held that Sivells waived his *Miranda* rights and knowingly and voluntarily agreed to speak with law enforcement, reasoning that Sivells "chose to keep on talking, despite . . . a thorough understanding and explanation of his rights." J.A. 817.  The court did not "find [Sivells's] question about using his cell phone to call his attorney [to be] an unequivocal assertion of his rights such that the officers were compelled to stop talking to him, even though he said he wished to continue." J.A. 818.

In *Miranda v. Arizona*, the Supreme Court held that the police must advise an accused person in custody of his right to counsel and, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. 436, 474 (1966).  Later, in *Edwards v. Arizona*, the Court explained that when an accused person "expresse[s] his desire to deal with the police only through counsel," the police cannot interrogate him "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85 (1981).  Two elements must therefore be examined to determine whether police have obtained a statement in violation of *Edwards*: (1) whether the accused actually

25

invoked his right to counsel, and (2) who initiated the further discussions that yielded the eventual statement. *Smith v. Illinois*, 469 U.S. 91, 95 (1984).

Regarding the invocation of the right, the Supreme Court in *Davis v. United States* held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." 512 U.S. 452, 459 (1994). We have numerous examples of equivocal requests for counsel that do not require the cessation of questioning. *See United States v. Johnson*, 400 F.3d 187, 195 (4th Cir. 2005) (collecting cases that have found statements like "Maybe I should talk to a lawyer," "I think I need a lawyer," "Do you think I need an attorney here?" "I might want to get a lawyer then, huh?" "I think I want a lawyer," "Do you think I need a lawyer?" to be equivocal requests for counsel that do not require the cessation of questioning (citations omitted)).

Sivells's statement "I can't use my cell phone to call my attorney" falls into this category of ambiguous or equivocal statements, as he did not unequivocally request an attorney. And, perhaps most importantly, the officers did not ignore Sivells. They made clear that they would stop the questioning if he wanted to have an attorney present. But instead of asking for an attorney, Sivells simply signed the waiver-of-rights form voluntarily, relinquishing his rights and continuing to speak with law enforcement.

We agree with the district court that Sivells did not invoke his right to counsel in the way that *Miranda* and *Edwards* require. Thus, we affirm the district court's denial of Sivells's motion to his suppress the statements he made to law enforcement.

26

VI.

Wilson and Pulley assert that their § 922(g)(1) convictions should be reversed after the Supreme Court's decision in *Rehaif*, 139 S. Ct. 2191. We affirm Wilson's conviction but find that Pulley's conviction should be reversed.

Wilson, in Count 8, and Pulley, in Count Ten, were convicted under 18 U.S.C. § 922(g)(1) for possessing firearms with previous convictions of crimes punishable by more than one year of imprisonment. After their trial, the Supreme Court in *Rehaif* held that in § 922(g) prosecutions, the government must prove that the defendant knew he possessed a firearm *and* that he belonged to a class of persons barred from possessing a firearm. 139 S. Ct. at 2200. Both parties agree that the district court did not instruct the jury to find that Wilson and Pulley knew they were in a prohibited class. Wilson and Pulley did not preserve their mens rea claims at trial, so plain-error review applies. *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021).

A defendant must satisfy three requirements for plain-error relief. First, an error must have occurred. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018). Second, the error must be plain. *Id.* Third, the error must affect the defendant's "substantial rights," meaning that there must be "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id.* at 1904–05 (quoting *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)). If a defendant meets these requirements, then an appellate court can grant relief if the error had a serious effect on the "fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1905 (quoting *Molina-Martinez*, 578 U.S. at 194).

27

Here, the lack of jury instruction is an error under *Rehaif,* and that error was plain, so the first two prongs of the plain-error test are satisfied. *See Greer*, 141 S. Ct. at 2097. So, we only concern ourselves with the third prong of plain error relief, whether the error affects the defendant's substantial rights.

Between the Appellants' opening brief deadline and the government's response brief deadline, the Supreme Court issued *Greer*, which held that, under the substantial rights prong, "a *Rehaif* error is not a basis for plain-error relief unless the defendant first makes a sufficient argument or representation on appeal that he would have presented evidence at trial that he did not in fact know he was a felon." 141 S. Ct. at 2100. It instructed courts to "determine whether the defendant has carried the burden of showing a 'reasonable probability' that the outcome of the district court proceeding would have been different." *Id.* A defendant who makes this showing would survive the plain error review. *Id.* at 2096.

## A.

We turn first to Pulley's conviction. As discussed, Pulley was convicted under § 922(g)(1), which makes it unlawful to possess a weapon for "any person" "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). The problem, Pulley explains, is that this code section is colloquially—and ubiquitously—known as a "felon-in-possession" prohibition. *See, e.g., Greer*, 141 S. Ct. at 2095; *United States v. Ball*, 18 F.4th 445, 456 (4th Cir. 2021); *United States v. Gilbert*, 430 F.3d 215, 218 (4th Cir. 2005); *see also United States v. Heyward*,

28

No. 18-4819, 2022 WL 3051258, at *4 (4th Cir., Aug. 3, 2022) (noting, however, that "[t]he word 'felon' . . . lacks some precision"). Even Pulley's indictment itself calls the § 922(g)(1) count "Felon in Possession of a Firearm." *See* J.A. 757. But all of Pulley's prior crimes were state-law misdemeanors, as both parties agree and Pulley's presentence report (PSR) confirms.[3] So, Pulley argues, even though he technically falls within the statutory prohibition, he did not *know* his relevant status as required by *Rehaif* and *Greer* at the time he committed the offense.

However, Pulley's misdemeanors caused him to be treated as a felon for the purposes of 18 U.S.C. § 922(g)(1). Indeed, the story is even more complicated than that, because to fully understand § 922(g)(1)'s restrictions, one must consult an entirely different section of the statute, which defines a "crime punishable by imprisonment for a term exceeding one year," § 921(a)(20)(B). *That* section explains that, when applied to misdemeanors, a "crime punishable by imprisonment for a term exceeding one year" means "any State offense classified by the laws of the State as a misdemeanor" and punishable by more than *two* years of imprisonment. *See* 18 U.S.C. § 921(a)(20)(B) (specifying that "the term 'crime punishable by imprisonment for a term exceeding one year' does *not* include" state misdemeanors "punishable by a term of imprisonment of two years or less" (emphasis added)). Section § 921(a)(20)(B) also explains that "[w]hat constitutes a conviction of

---

[3] The government initially claimed that Pulley has felony convictions. *See* Government's Response Br. 48. That contention is incorrect. The government conceded at oral argument that Pulley's prior convictions were all state-law misdemeanors.

such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." *Id.*

Pulley acknowledges that his misdemeanor convictions fall into this category and that § 922(g)(1) still bars him from possessing a firearm. But, he claims, for the knowledge of status element, he did not *know* that he fell within the relevant status for § 922(g)(1) because he was a state-level misdemeanant, not a felon. We agree that this distinction matters for a law referred to time and time again as "felon-in-possession." *See, e.g.*, *Greer*, 139 S. Ct. at 2095; *Ball*, 18 F.4th at 456; *Gilbert*, 430 F.3d at 218.

Pulley's PSR shows that he was convicted of several misdemeanors under state law before the instant case. He received only one sentence of over two years: for his misdemeanor conviction in 2013 for unauthorized removal of property under Md. Code Ann., Crim. Law § 7-203, Pulley was sentenced to three years' imprisonment, but all but three months of that sentence were suspended. The longest term of custody Pulley received was 17 months' imprisonment for misdemeanor drug possession under Md. Code Ann., Crim. Law § 5-601(a)(1).

While recognizing that Pulley's misdemeanors do place him into the category of people prohibited from possessing firearms, there is a lack of record evidence that Pulley knew that he was convicted of a state crime for which the punishment was for more than two years, especially when his crimes were labeled as misdemeanors. Therefore, we agree with Pulley that the *Rehaif* error affected his substantial rights, and his challenge thus survives plain-error review. After all, *Rehaif* instructed that for a § 922(g) conviction, the government must prove beyond a reasonable doubt that the defendant "*knew* he belonged

30

to the relevant category of persons barred from possessing a firearm." 139 S. Ct. at 2200 (emphasis added). In a case like this one, where the defendant's qualifying predicate conviction is a state-law misdemeanor, that means the government must "prove that [the defendant] knew, when he possessed the firearm, that his prior state conviction was punishable by more than two years of imprisonment." *Heyward*, 2022 WL 3051258, at *4.

True, *Greer* explains that it is an "uphill climb" to show a reasonable probability that the outcome would have been different in a § 922(g)(1) prosecution for people who are in fact felons. 141 S. Ct. at 2097. But *Greer* said the reason for this uphill climb was "simple": "If a person is a felon, he ordinarily knows he is a felon." *Id.* Indeed, "[f]elony status is simply not the kind of thing that one forgets." *Id.* (quoting *United States v. Gary*, 963 F.3d 420, 423 (4th Cir. 2020) (Wilkinson, J., concurring in denial of reh'g en banc)). *Greer* recognized that this "simple truth is not lost upon juries"; "absent a reason to conclude otherwise, a jury will usually find that a defendant *knew* he was a felon based on the fact that he *was* a felon." *Id.*

This "uphill climb" for people who are in fact felons makes sense in the context of § 922(g)(1). As explained, courts, counsel, and citizens alike refer to the crime as "felon-in-possession." *Greer* itself repeatedly refers to § 922(g)(1) as felon-in-possession and discusses how *Rehaif* impacts "felon-in-possession cases." *See, e.g., id.* at 2095 ("In felon-in-possession cases after *Rehaif*, the Government must prove not only that the defendant knew he possessed a firearm, but also that *he knew he was a felon* when he possessed the firearm"). But that logic does not translate well to state-law misdemeanants. *See id.* at 2100 ("*In felon-in-possession cases*, a *Rehaif* error is not a basis for plain-error relief unless

31

the defendant first makes a sufficient argument or representation that on appeal he would have presented evidence at trial that he did not in fact know he was a felon" (emphasis added)); *see also Heyward*, 2022 WL 3051258, at *4 (explaining, however, that while "[i]t is common to describe 18 U.S.C. § 992(g)(1) as the 'felon-in-possession' statute" and while, "in *Greer*, the Supreme Court repeatedly shorthanded the [relevant] knowledge requirement as whether the defendant '*knew he was a felon*,' . . . [t]he word 'felon' . . . lacks some precision" because "[w]hat the statutory text [actually] forbids is possessing a firearm after having been convicted of 'a crime punishable by imprisonment for a term exceeding one year," as that phrase is defined in 18 U.S.C. § 921(a)(20)).

So, we believe that Pulley's is a different case from *Greer*. As someone not convicted of a crime labeled as a felony, Pulley might not face the same uphill battle to show that the *Rehaif* error affected his substantial rights. While a person may ordinarily know he is a felon, we do not believe we can infer that a person convicted only of misdemeanors "ordinarily knows" their status for the purposes of plain error review following a *Rehaif* instruction error. The *Greer* concurrence supports our reasoning, recognizing that there are many reasons a defendant may not know his status, including "[f]or example, a defendant may not understand that . . . a misdemeanor under state law can be a felony for purposes of federal law." 141 S. Ct. at 2103 (Sotomayor, J., concurring in part and dissenting in part). While *Greer* opens the door for courts to presume a person knows they are a felon, we do not believe we can apply this simple presumption to Pulley, a state-law misdemeanant.

32

In the end, to obtain plain-error relief, Pulley needs to show only that there is a reasonable probability that, without the *Rehaif* error, the outcome would have been different. We believe Pulley has shown just that. The record is devoid of any evidence that Pulley knew that he was convicted of a state crime for which the punishment was for more than two years. Unlike the defendants in *Greer* who had been convicted of multiple *felonies*, Pulley was only convicted of state crimes labeled as misdemeanors. He never served more than two years in prison. *See* Reply Br. at 24. And while he was sentenced to a term of imprisonment exceeding two years, the judge simultaneously suspended the vast majority of that sentence, raising a question as to whether he actually knew he had been convicted of a crime punishable by more than two years when he possessed a firearm several years later. Moreover, he only stipulated at trial that he had been convicted of a crime punishable by imprisonment for more than *one* year, not *two*. *See* J.A. 3034. "If a defendant demonstrates why a jury in an error-free trial might have reasonable doubts as to the knowledge-of-felon-status element, he has shown a reasonable probability of a different outcome." *Greer*, 141 S. Ct. at 2103 (Sotomayor, J., concurring in part and dissenting in part). Pulley has demonstrated such a probability. If the circumstances here do not affect Pulley's substantial rights, we find it difficult to imagine a case that *would* satisfy plain-error review. And there must be some cases where a *Rehaif* error warrants reversal, lest we risk closing the door *Greer* deliberately left open.

We find there is a reasonable probability that a jury would have "reasonable doubts as to the knowledge-of-felon-status element," *Greer*, 141 S. Ct. at 2103 (Sotomayor, J., concurring in part and dissenting in part), which requires that Pulley knew that his

33

misdemeanors placed him into "the relevant category of persons barred from possessing a firearm," *Rehaif*, 139 S. Ct. at 2200.  Thus, the district court's *Rehaif* error affected Pulley's substantial rights.

Having found that the district court erred in its jury instructions, the error was plain, and the error affected Pulley's substantial rights, we may grant relief if the error had a serious effect on the "fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles*, 138 S. Ct. at 1905.  This final plain-error requirement "is meant to be applied on a case-specific and fact-intensive basis." *Puckett v. United States*, 556 U.S. 129, 142 (2009).  Based on these facts, we find that the *Rehaif* error had just such a serious effect on Pulley's § 922(g) conviction.  Pulley has "demonstrate[d] why a jury in an error-free trial might have reasonable doubts as to the knowledge-of-felon-status element," *Greer*, 141 S. Ct. at 2103 (Sotomayor, J., concurring in part and dissenting in part), thus calling into question whether a jury would have convicted Pulley had they been required to find beyond a reasonable doubt that he knew at the time of his firearm possession that he had been convicted of a crime punishable by more than two years.  And we believe that "this case presents circumstances in which a miscarriage of justice would . . . result," if we affirmed Pulley's conviction.  *United States v. Mitchell*, 1 F.3d 235, 244 (4th Cir. 1993) (cleaned up).  Therefore, we use our discretion to grant relief.

### B.

We turn next to Wilson's claim that his § 922(g) conviction should be vacated under *Rehaif*.  In his reply, which was his first opportunity to discuss *Greer*, Wilson offers no

argument on his felon-in-possession conviction. Appellants' Reply Br. 17. Unlike Pulley, Wilson had been convicted of robbery with a dangerous weapon, which is a felony under Maryland law. Thus, the presumption that he would ordinarily know he was a felon applies. *Greer*, 141 S. Ct. at 2097. Because Wilson offers no argument to rebut that presumption—he does not discuss at all what evidence he would have presented to the jury that he did not know he was a felon—we affirm his conviction.

## VII.

Barronette and Pulley contend that the district court abused its discretion by denying their motion for a mistrial because a government witness, Anthony Boyd, stated during cross-examination that he saw a news report that Barronette was the "number one gun puller in Baltimore." J.A. 2403.29. Barronette and Pulley moved for a mistrial after that statement. The district court denied the motion, noting that it thought "the comment was invited." J.A. 2403.30. But it nevertheless instructed the jury to ignore the comment. We affirm the district court.

"[D]enial of a defendant's motion for a mistrial is within the sound discretion of the district court." *United States v. Dorloius*, 107 F.3d 248, 257 (4th Cir. 1997) (citations omitted). "[O]n a courtroom issue such as this, the district court is best positioned to assess whether a mistrial is warranted or whether other means exist to address the issue adequately." *United States v. Taylor*, 942 F.3d 205, 221 (4th Cir. 2019). We have explained that "[b]ecause a mistrial is so drastic a step, we will disturb the district court's refusal to grant one only in extraordinary circumstances, such as when evidence is admitted

35

that would prejudice the defendant, and there is an 'overwhelming probability' that the jury would be unable to heed a curative instruction to ignore it." *Id.* at 221–22 (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

Barronette and Pulley have not established how this witness statement is an "extraordinary circumstance" that prejudiced them. First, the statement only concerned Barronette, not Pulley. Second, while the statement was related to Barronette's guilt, we find that Barronette was not prejudiced. The district court gave a curative instruction, and we do not find there is an overwhelming probability that the jury was unable to heed it. To the contrary, the jury was able to make individual guilt determinations for Barronette here. *See* J.A. 3393 (finding Barronette did *not* conspire to murder David Moore). In *Taylor*, we emphasized that "there is no prejudice if we determine that the jury, despite the incident in question, was able to 'make individual guilt determinations by following the court's cautionary instructions.'" 942 F.3d at 221 (quoting *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008)). Further, like in *Taylor*, Boyd's statement "was not instigated by the government but occurred during cross-examination by [Barronette's] counsel." *Id.* at 222.

Barronette and Pulley have not shown that the district court abused its discretion, and thus, we affirm.

## VIII.

Appellants argue the jury lacked sufficient evidence to find that (1) the alleged RICO conspiracy substantially affected interstate commerce; (2) Wilson possessed a

36

firearm in furtherance of a drug conspiracy; (3) the drug conspiracy involved one kilogram or more of heroin; (4) Sivells and Floyd conspired to murder Antonio Addison; and (5) Broughton conspired to murder unknown individuals.  We disagree and find that there was sufficient evidence for the jury's verdicts.

We review the sufficiency of the evidence to determine whether "*any* rational trier of fact could have found" that all elements of the charged offenses were proven beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Our review of jury verdicts is highly deferential.  "[A] jury verdict '*must be sustained* if there is substantial evidence, taking the view most favorable to the Government, to support it.'"  *Burgos*, 94 F.3d at 862 (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)).  And a court "may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable."  *Id.*

A.

Appellants assert that all convictions as to Count One, the RICO conspiracy, should be reversed because the government failed to prove that the alleged racketeering enterprise substantially affected interstate commerce.  *See United States v. Mathis*, 932 F.3d 242, 258 (4th Cir. 2019) (explaining the government must show "that an enterprise affecting interstate commerce existed" to sustain a RICO conviction).  We disagree.

Appellants contend that any RICO conspiracy was confined to a neighborhood in Baltimore.  But the government must only prove a "de minimis" effect on interstate commerce.  *United States v. Zelaya*, 908 F.3d 920, 926 (4th Cir. 2018).  For example, the

37

government can satisfy this element by introducing evidence that "the gang regularly communicated by phone and committed multiple robberies using guns that traveled in interstate commerce." *United States v. Cornell*, 780 F.3d 616, 622–23 (4th Cir. 2015) (citation omitted). It can also establish this element by showing that the drug products sold by Appellants originated outside the United States. *United States v. Gray*, 137 F.3d 765, 773 (4th Cir. 1998) (en banc).

Appellants argue that the de minimis standard does not apply to their activity because it was purely intrastate activity. They cite *United States v. Robertson*, which stated that "[t]he 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects." 514 U.S. 669, 671 (1995) (citing *Wickard v. Filburn*, 317 U.S. 111 (1942)).

But the de minimis standard does in fact apply. In *Gonzales v. Raich*, the Supreme Court made clear that "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" 545 U.S. 1, 17 (2005) (quoting *United States v. Lopez*, 514 U.S. 549, 558 (1995)). Thus, we have repeatedly held that the de minimis standard applies to RICO conspiracies. *See United States v. Gutierrez*, 963 F.3d 320, 339 n.7 (4th Cir. 2020); *Cornell*, 780 F.3d at 622.

Here, there is sufficient evidence that Appellants' conspiracy affected interstate commerce. The government introduced evidence that Appellants used guns manufactured outside of Maryland. J.A. 2386, 2388. There was testimony that the drugs Appellants sold

38

were produced outside the United States and shipped into the country. J.A. 2531.1–.3. Finally, Appellants used phones, which are "channels of interstate commerce," *see Gibbs v. Babbitt*, 214 F.3d 484, 490–91 (4th Cir. 2000), to coordinate drugs sales and TTG's business. Construing all this evidence in the light most favorable to the government, we find there is sufficient evidence that the conspiracy affected interstate commerce.

B.

Wilson challenges the sufficiency of the evidence for his § 924(c) conviction for using a firearm in furtherance of drug trafficking. To support a conviction under § 924(c), the government must establish: "(1) the defendant used or carried a firearm, and (2) the defendant did so during and in relation to a drug trafficking offense or crime of violence." *United States v. Mitchell*, 104 F.3d 649, 652 (4th Cir. 1997). Wilson contends that there was insufficient evidence to link the gun to drug trafficking. We disagree.

Law enforcement recovered the gun after executing a search warrant at Wilson's girlfriend's residence. Wilson admitted to law enforcement that he knowingly possessed the firearm. The gun was loaded and found in the same room as seventy-five vials of suspected cocaine and in close proximity to about $12,000 in cash. Although Wilson explained that he obtained the gun to defend his home, we have found that evidence of a loaded gun in close proximity to drug paraphernalia is sufficient evidence for a § 924(c) conviction. *United States v. Howard*, 773 F.3d 519, 527 (4th Cir. 2014). In line with this precedent, we find that there is sufficient evidence for Wilson's conviction.

39

C.

Appellants next assert that the jury lacked sufficient evidence to conclude that the narcotics conspiracy involved one kilogram or more of heroin distribution foreseeable to each Appellant. We find there is sufficient evidence.

In light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the government's indictment must allege and the jury must find beyond a reasonable doubt any threshold drug weights that trigger enhanced mandatory minimum penalties in 21 U.S.C. § 841(b)(1)(A). *United States v. Promise*, 255 F.3d 150, 152 (4th Cir. 2001) (en banc). Additionally, for the drug weight to trigger enhanced mandatory minimum sentences for conspiracy offenses, "the *jury* must determine that the threshold drug quantity was reasonably foreseeable to the defendant" participating in the conspiracy. *United States v. Jeffers*, 570 F.3d 557, 569 (4th Cir. 2009). But to arrive at a drug-weight finding, the jury may rely on circumstantial evidence. *See United States v. Cole*, 69 F.3d 534, at *1 (4th Cir. 1995) ("The district court had clear authority to approximate the quantity of a drug in its determination of relevant conduct and to rely upon circumstantial evidence and statistical methods in making that determination.") (citing *United States v. Uwaeme*, 975 F.2d 1016, 1021 (4th Cir. 1992)).

Here, the indictment alleged a conspiracy that spanned seven years. At trial, the government put on evidence of controlled buys that established 180 grams of drug weight. There was testimony from drug customers about their usual purchases that established another, at least, 450 grams. Evidence about the amount of money Barronette, Sivells, and Floyd made establishes that their drug weights exceed one kilogram. There was also

40

evidence from wiretap calls in which customers ordered various amounts of heroin. After a thorough review of the record, we are confident that the drug conspiracy involved more than one kilogram of heroin, and we affirm the jury's verdict.

D.

Sivells and Floyd contend that the government failed to prove beyond a reasonable doubt that they conspired to murder Antonio Addison, one of the predicate offenses in the RICO conspiracy charge in Count One. The jury issued a special verdict finding that Sivells and Floyd conspired to murder Addison. We find there is sufficient evidence for this special verdict. Thus, we affirm.

The government established without question that Antonio Addison was murdered on May 25, 2016. His murder was part of a conflict between TTG members and Cedric Catchings, Andrew Johnson, Amos Johnson, Brandon Bazemore, and Addison. The conflict began because the TTG members believed Andrew Johnson had cooperated with law enforcement.

The government introduced evidence from wiretapped phone calls that showed that TTG members were surveilling the men. In April 2016, Floyd reported Addison's whereabouts to Barronette several times. In early May 2016, Floyd told Sivells that he was watching Catchings walk down the street, and they discussed how Catchings was working with Addison and others that they believed were cooperating with law enforcement. Then, on May 25, 2016, an individual fired shots into a car occupied by Bazemore and Johnson.

41

After the shooting, Sivells, in a wiretapped call, asked the shooter whether he had "hit" Bazemore.  J.A. 3761.

Then, also on May 25, 2016, Sivells and Barronette observed Addison and Johnson together in a vehicle.  That same day, Addison was murdered.  Tyree Paige, another person who sold drugs in the neighborhood, testified that he heard Sivells say that Addison was "supporting a rat, so [he] had to go, too." J.A. 1689.  Paige then testified that he saw Sivells and Barronette driving on Calhoun Street, with guns, towards where Addison was shot.  He then heard gunshots and saw Sivells and Barronette return right after to Calhoun Street.  Additionally, Sivells's cell phone records confirm that he was near the site of Addison's murder during the time period of his murder.

Based on this evidence, we find that there is sufficient evidence to sustain the jury's verdict that Sivells and Floyd conspired to murder Addison.  Sivells contends that "[o]nly one witness linked Sivells to the homicide: Tyree Paige, whose testimony tested and then busted through the limits of witness credibility."  Opening Br. 64.  While we recognize there were inconsistencies in Paige's testimony, "a reviewing court is not entitled to assess the credibility of witnesses."  *United States v. Brooks*, 524 F.3d 549, 563 (4th Cir. 2008).  Rather, we "must assume that the jury resolved all contradictions . . . in favor of the Government." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993) (citation omitted). And we have found the uncorroborated testimony of one witness to be sufficient evidence to sustain a conviction. *See United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997); *United States v. Baker*, 985 F.2d 1248, 1255 (4th Cir. 1993); *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983).  But here, the

42

testimony was indeed corroborated, as the government provided GPS data and wiretaps. Evidence showed that both men participated in the conspiracy to murder Addison. Under the highly deferential standard of review we must employ, we find that there was sufficient evidence to sustain the special verdict against Sivells and Floyd.

E.

Broughton also contends that the jury's special verdict finding that he conspired to murder unknown individuals—one of the predicate offenses in the RICO conspiracy charged in Count One—lacks sufficient evidence. We disagree.

The government introduced evidence of a series of wiretap calls between Broughton, Sivells, and Barronette, which occurred after another TTG member had the drugs he was carrying stolen. Broughton was on the street looking for the individuals who stole the drugs, while Barronette and Sivells were together in one car. Broughton made several calls to Barronette calling out the individuals' location. Broughton said, "Stay wit em [sic], come on." J.A. 3041–46. Sivells commented that Broughton was supposed to kill the individuals as they walked past. J.A. 3043 ("Why f**k Marty let 'em go past him though. He froze? That's supposed to be his time to shine."); *see also* J.A. 3045 (regarding what the individuals stole, "They took what? He better go shoot that motha f**ka up.") There was also evidence that Barronette wanted to grab a firearm. J.A. 3042 ("About to grab that other jimmy mack.").

Ultimately, Barronette and Broughton did not shoot the individuals because law enforcement moved into the area to disrupt the potential violence. Broughton discarded

43

two firearms during the police chase. In later a wiretapped call, Broughton said "I was for, I was for [unintelligible], I was gonna pow! Hit him right in the head." J.A. 3044.

These facts, taken in the light most favorable to the government, are sufficient to sustain the jury's verdict under our highly deferential standard. We affirm.

IX.

Harrison challenges the district court's admission of statements that murder victim Markee Brown made prior to his death to police and a grand jury,[4] on April 13, 2016, in which Brown stated that Harrison robbed him and Dominique Harris and then Harrison murdered Harris. The jury in this case issued a special verdict finding that Harrison conspired to commit the premeditated murder of Harris. Harrison argues that the admission of this testimony violated his rights under the Confrontation Clause since Brown himself did not testify because he was murdered before the trial at issue here. We affirm the district court's admission of the statements.

"This Court reviews evidentiary rulings implicating constitutional claims de novo." *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011).

The second superseding indictment alleged that on December 28, 2015, Harrison robbed Harris and Brown of drugs and money. Shortly thereafter, Harrison murdered Harris. Harrison was later charged in state court with robbery and Brown identified

---

[4] This grand jury was for separate state court charges against Harrison that occurred before Appellants were indicted in this case.

44

Harrison as the perpetrator to the police and a grand jury. A few days after Brown testified, TTG members murdered Brown.

At trial, over Harrison's objection, the district court found that Brown's testimony was admissible under the forfeiture-by-wrongdoing exception to the Confrontation Clause and to the hearsay rule because it found by a preponderance of the evidence that TTG members murdered Brown to prevent him from testifying and Harrison acquiesced in that murder. *See* Fed. R. Evid. 804(b)(6); *United States v. Jackson*, 706 F.3d 264, 267 (4th Cir. 2013) (recognizing the forfeiture-by-wrongdoing exception to the Confrontation Clause).

Harrison asserts that there is insufficient evidence that he acquiesced in Brown's murder and that Brown's statements should not have been admitted under the forfeiture-by-wrongdoing exception. But we need not decide whether there was enough evidence to find that Harrison acquiesced in Harris's murder because any error was harmless. "Evidentiary rulings are 'subject to harmless error review'" and "a Confrontation Clause violation may be found harmless on appeal." *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007) (quoting *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997)). "Erroneously admitted evidence is harmless if a reviewing court is able to determine that 'the constitutional error was harmless beyond a reasonable doubt.'" *United States v. Williams*, 632 F.3d 129, 132 (4th Cir. 2011) (quoting *United States v. Abu Ali*, 528 F.3d 210, 256 (4th Cir. 2008)).

While Brown's testimony is the main evidence connecting Harrison to Harris's murder, the special verdict affects neither his Count One conviction nor his Guidelines

45

range.  There are sufficient predicate acts to sustain the Count One conviction, even without this special verdict.

"[T]o establish a RICO conspiracy the government must prove 'that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.'"  *Cornell*, 780 F.3d at 623 (quoting *United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012)).  "Racketeering acts, often referred to as predicate acts, include any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance chargeable under state law and punishable by imprisonment for more than one year."  *Id.* (citing 18 U.S.C. § 1961(1)).  A defendant may be guilty of a RICO conspiracy "even if [he] does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997).  The government needs to prove only that co-conspirators "agree[d] to pursue the same criminal objective," but they "may divide up the work."  *Id*.  In other words, RICO conspiracy does not "requir[e] the Government to prove each conspirator agreed that he would be the one to commit two predicate acts."  *Id.* at 64.  And "[r]eversal of . . . a conviction on a substantive RICO count is not required simply because some predicate acts are factually insufficient, as long as there remain at least two adequately proven acts."  *United States v. Browne*, 505 F.3d 1229, 1261 (11th Cir. 2007).

In this case, the jury found more than two predicate racketeering acts, as it convicted each defendant on the drug-trafficking charges in Count 3 and issued several special murder verdicts which were not appealed.  These acts are attributable to each Appellant as

46

members of the RICO enterprise.  Therefore, there were sufficient predicate racketeering offenses to convict Harrison of RICO conspiracy in Count One.  The jury also found that Harrison conspired to commit premeditated murder of two other people and thus the Guidelines would advise a life sentence for Harrison even without the special verdict for Harris's murder.  *See* U.S.S.G. § 2E1.1(a)(2) (instructing to apply "the offense level applicable to the underlying racketeering activity" as long as it exceeds 19); U.S.S.G. § 2A1.1 (base offense level for first degree murder is 43).  Thus, even if the district court erred in allowing Brown's testimony, that error is harmless as Harrison's convictions and the Guidelines range would have been the same.  We therefore affirm.

## X.

Sivells, Broughton, and Floyd finally assert that their sentences are procedurally and substantively unreasonable.

We "review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007).  First, this Court "ensure[s] that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." *United States v. Fowler*, 948 F.3d 663, 668 (4th Cir. 2020) (quoting *Gall*, 552 U.S. at 51).  "If the Court 'finds no significant procedural error, it then considers

47

the substantive reasonableness of the sentence imposed.'" *United States v. Arbaugh*, 951 F.3d 167, 172 (4th Cir. 2020) (cleaned up) (quoting *United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011)).  The Court's review for substantive reasonableness "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range."  *Gall*, 552 U.S. at 51.  "A within-Guidelines range sentence is presumptively reasonable."  *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017) (citation omitted).

## A.

Sivells was sentenced to life imprisonment.  He contends the district court procedurally erred by failing to adequately respond to his mitigation evidence and that his sentence was substantively unreasonable.  We disagree and affirm his sentence.

A district court commits a procedural error if it entirely fails to consider a defendant's "non-frivolous arguments for a lower sentence."  *United States v. Webb*, 965 F.3d 262, 268 (4th Cir. 2020).  It must, at a minimum, "put on the record its consideration of [a defendant's] non-frivolous arguments for a lower sentence or explain its rejection of those arguments."  *Id.* at 272.

Sivells presented several factors to the court to support his request for a 30-year sentence.  He pointed to his difficult childhood, his abandonment by his parents, and his low IQ which placed him in the lowest one percent of intellectual functioning.  The district court agreed that "Sivells had a very difficult and destructive childhood" and "that he has the neuropsychological issues that have been documented."  J.A. 3520.  But the court then

48

said that "many other people go through the kind of background or history and do not involve themselves in the violence." J.A. 3521. It concluded, "the tragedy that we can all sympathize with about his childhood . . . is, to me, outweighed by the need to recognize this most serious of crimes, combination of crimes that he has committed, and the need to protect the public." J.A. 3521.

We find that the district court adequately addressed Sivells's mitigation evidence and thus find no procedural error. *See United States v. Johnson*, 587 F.3d 625, 639 (4th Cir. 2009).

Regarding substantive reasonableness, Sivells's sentence was within his Guidelines range and thus is "presumptively reasonable." *White*, 850 F.3d at 674. Sivells argues that the district court improperly compared him to "hypothetical 'others,'" Opening Br. 79, and placed unwarranted weight on Sivells's possession of a shank during a prior period of incarceration. We disagree that the district court imposed a substantively unreasonable sentence. The record reflects that the district court discussed Sivells's status as a leader in TTG, his criminal history, the need to deter him, the seriousness of his crimes, and the need to protect the public. The court thus clearly addressed the § 3553(a) factors and explained the sentence. We find that Sivells has failed to rebut the presumption of reasonableness and affirm.

## B.

Broughton was sentenced to 360 months of imprisonment, which falls within his Guidelines range of 292–365 months. Broughton alleges (1) the district court procedurally

49

erred by applying a two-level enhancement because it found he "used violence, made a credible threat of violence, or directed the use of violence" under U.S.S.G. § 2D1.1(b)(2); and (2) that the district court imposed a procedurally and substantively unreasonable sentence by failing to consider that his criminal history score overstated the seriousness of his record and his mitigation evidence. Unpersuaded, we affirm his sentence.

"We review findings of fact relating to sentencing enhancements for clear error." *United States v. McAllister*, 272 F.3d 228, 234 (4th Cir. 2001). We find that the district court did not clearly err in finding that Broughton "used violence, made a credible threat of violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). The district court based its findings on conversations that Broughton had with co-conspirators when he was tracking the unknown individuals, whom the jury found he conspired to murder. In those conversations, Broughton directed Barronette and Sivells to "stay with 'em," and exclaimed, "I was for, I was for, I was gonna pow! Hit him right in the head." J.A. 3044. We find that the district court did not clearly err in determining that Broughton directed violence and thus affirm the enhancement.

Broughton also contends his sentence was procedurally unreasonable because the district court failed to address his several mitigation arguments about his childhood.

At sentencing, the district court said:

> Certainly there are mitigating circumstances, about Mr. Broughton's childhood, the possibility of lead paint poisoning, just difficulties in how he was brought up. I certainly understand that. . . . But there is a very significant need to protect the public here, to recognize the seriousness of the offense, as well as to deter, I believe Mr. Broughton, as well as others generally, that requires a significant sentence, despite the mitigating factors that have been pointed out.

50

J.A. 3458. We find that the district court met its minimum requirement by considering and rejecting the mitigating arguments. The court also engaged counsel on both sides to argue about the appropriateness of a downward variance. *See United States v. Blue*, 877 F.3d 513, 521 (4th Cir. 2017) ("Reviewing courts may also infer that a sentencing court gave specific attention to a defendant's argument for a downward departure if the sentencing court engages counsel in a discussion about that argument."). Thus, we hold that the court properly addressed Broughton's arguments and did not procedurally err.

Finally, Broughton contends that his sentence is substantively unreasonable because the effect of a probation violation overstated his criminal history. Broughton's sentence is within his Guidelines range and thus is presumptively reasonable. *White*, 850 F.3d at 674. Broughton principally takes issue with the fact that one of his convictions counted toward his criminal history score even though he originally received a probation-before-judgment (PBJ) diversionary sentence for an assault conviction in state court. The state court judge struck the PBJ after Broughton did not complete a required diversionary program and found Broughton to be in violation of his probation and guilty of the substantive offense of assault. Broughton asserts that the effects of failing to complete a diversionary program, i.e., the violation of probation and assault convictions, overstated his criminal history by giving him a criminal history category of V.

Broughton does not argue that his criminal history category or Guidelines range were incorrect. He instead contends that it was substantively unreasonable under U.S.S.G § 4A1.3(b)(1) for the district court to not depart downward. A district court has discretion

51

to depart downward "[i]f reliable information indicates that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]"  U.S.S.G. § 4A1.3(b)(1); *see also United States v. Hackley*, 662 F.3d 671, 686 (4th Cir. 2011).  But we "lack the authority to review a sentencing court's denial of a downward departure unless the court failed to understand its authority to do so." *Id.* (quoting *United States v. Brewer*, 520 F.3d 367, 371 (4th Cir. 2008)).  Thus, we must reject Broughton's argument that the district court erred in not granting him a downward departure under U.S.S.G. § 4A1.3(b)(1).  We affirm Broughton's sentence.

C.

Floyd was sentenced to 30 years of imprisonment on each count, to be served concurrently.  He brings three challenges to his sentence: (1) the district court procedurally erred by enhancing his offense levels pursuant to U.S.S.G. § 2A1.5(b)(1); (2) the district court erred in finding Floyd to be a career offender pursuant to U.S.S.G. § 4A1.1; and (3) his sentence was procedurally and substantively unreasonable.  None of these challenges are persuasive, and we affirm Floyd's sentence.

Regarding Floyd's first argument, U.S.S.G. § 2A1.5(b)(1) provides: "If the offense involved the offer or the receipt of anything of pecuniary value for the undertaking of murder, increase by 4 levels."  The district court applied this enhancement based on Floyd's role in the attempted murder of Cedric Catchings.  The enhancement raised his offense level for the RICO conspiracy conviction in Count One to 37.  However, Floyd's total

52

offense level, regardless of this enhancement, was 43 because of his role in Addison's murder.[5]  Floyd contends the enhancement added a unit to his offense level.  Floyd did receive a one-level enhancement for the number of units assigned under U.S.S.G. § 3D1.4, but that enhancement did not impact his total offense level because it was already at the maximum level of 43.  So, even if there was an error in applying this enhancement, the § 2A1.5(b)(1) enhancement did not impact Floyd's Guidelines range. Further, the district court stated it would have imposed the same sentence "regardless of the presentence report [or] advisory guideline calculations[.]"  J.A. 3550–51.

We find that any error in applying this enhancement is harmless.  "A Guidelines error is considered harmless if we determine that (1) 'the district court would have reached the same result even if it had decided the guidelines issue the other way,' and (2) 'the sentence would be reasonable even if the guidelines issue had been decided in the defendant's favor.'"  *United States v. Gomez-Jimenez*, 750 F.3d 370, 382 (4th Cir. 2014) (quoting *United States v. Savillon-Matute*, 636 F.3d 119, 123 (4th Cir. 2011)).  We find both prongs are satisfied here.

Likewise, we hold that any error in designating Floyd as a career offender is harmless because that designation did not impact his Guidelines range or sentence.  As we detailed above, Floyd's total offense level is 43 regardless of any other enhancements, including the career-offender designation, which gave him a Guidelines range of a life

---

[5] While Floyd appeals the special verdict finding that he conspired to murder Addison, he does not challenge the district court's independent finding that he conspired to murder Addison, nor did he object to that finding in the PSR.

sentence.  Again, the district court said it believed a downward variance of 30 years "is the reasonable sentence," regardless of the PSR or "whether the career offender [enhancement] is or is not accurate."  J.A. 3550–51.  We thus hold that any error with designating Floyd as a career offender is harmless.

Finally, Floyd asserts his sentence is not substantively reasonable because the court "made no individualized assessment."  Opening Br. 90.  We disagree.  The district court discussed Floyd's individual role in the conspiracy, compared his role to his co-defendants, and granted a significant downward variance from life to 30 years.  We reject the argument that Floyd's sentence is substantively unreasonable and affirm his sentence.

XI.

For the above reasons, we REVERSE Pulley's § 922(g)(1) conviction, VACATE the judgment as to him, AND REMAND for further proceedings consistent with our opinion.  The remaining convictions and sentences are AFFIRMED.

*Nos. 19-4123, 19-4160, 19-4180, 19-4181,*
*19-4328, 19-4408, and 19-4562, AFFIRMED;*
*No. 19-4726, AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED FOR FURTHER PROCEEDINGS*

54